**STATE of Minnesota, Respondent,**

v.

**Twarna (NMN) RICHARDSON, Appellant.**

**No. C1-84-2106.**

Supreme Court of Minnesota.

Oct. 3, 1986.

C. Paul Jones, Minn. State Public Defender, Elizabeth B. Davis Asst. State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Thomas L. Johnson, Hennepin Co. Atty., Vernon E. Bergstrom, Chief, Appellate Section, Paul R. Jennings, Asst. Co. Atty., Minneapolis, for respondent.

YETKA, Justice.

Appellant-defendant, Twarna Richardson, appeals her conviction for the first-degree murder of Craig Smith, arguing that the evidence was insufficient to support the jury's finding of murder in the first degree and that the jury instructions on the issue of self-defense were inadequate. Appellant also appeals from an order of the trial court judge denying the appellant post-conviction relief because of a recantation by one of the murder trial witnesses. The judge held the new evidence to be unreliable hearsay and unlikely to have altered the jury's verdict. We affirm the conviction.

The victim of this homicide, Craig Smith, was killed on July 23, 1984. However, the relevant facts in this case stretch back for a period of 2 years prior to the final, fatal confrontation between Craig Smith and the defendant, Twarna Richardson.

In December 1981, Twarna Richardson met Phyllis Sorrell at a party in Minneapolis. Sorrell, both then and at the time of the shooting, was Craig Smith's girl friend. Defendant and Sorrell got into a fight for unexplained reasons. Defendant, who is 5′ 2″ and 200 pounds, bloodied the nose of Sorrell, who stands 5′ 3″ and weighs 112 pounds. Subsequently, as Sorrell and her friends left the party, one of her friends took defendant's coat. The coat was later tossed out of Sorrell's car while she and her friends were on the freeway.

Shortly after this incident, Sorrell and Smith left on a 2–year trip across the western United States. During this trip, Sorrell and Smith lived on Sorrell's earnings as a prostitute and Smith's gambling.

In June of 1984, Sorrell and Smith returned to Minneapolis where Sorrell continued to work as a prostitute. On July 14, 1984, Sorrell encountered defendant in downtown Minneapolis near the Speakeasy Bar. Defendant, who was then 19, demanded $10 for the coat destroyed 2 years before. Sorrell refused to pay. After the refusal, defendant chased Sorrell, first with a bottle she had picked up and broken and

then with a stick. Sorrell escaped by running away.

Subsequently, there were other encounters between Sorrell and defendant. As to an incident which occurred at a grocery store, the two gave widely diverging accounts. Sorrell claimed she was attacked by defendant, who was in the company of ten 15– to 16–year–old girls. According to defendant, she was at the grocery store when Smith and Sorrell came up and began kicking and hitting her. Another time, Sorrell claimed to have asked for help from a policeman after being threatened by defendant in downtown Minneapolis. Sorrell told Smith about these encounters. Smith was 5′9″ tall, weighed 232 pounds and was 21 years old. He was referred to on the street as "Big Daddy." Defendant had known of Smith for about 3 years.

Matters grew more intense. Witnesses testified that, on the early evening of July 23, 1984, before the murder, Smith came up to defendant at the Minneapolis Elks Club in north Minneapolis and threatened to hurt her if she messed with his girl friend. Defendant claims Smith actually threatened to kill her at the time and that he had a weapon which appeared to be a gun. According to her girl friends—Alice Johnson and Lakashia Spencer—defendant had a gun before the Elks Club encounter, but defendant herself claimed not to have purchased the gun until after the Elks Club incident.

After defendant's encounter at the Elks Club with Smith, defendant left with Alice Johnson and the two picked up Lakashia Spencer and, admittedly, drove downtown with the intention, as defendant stated to the two girls, to "fuck a girl up." She also told Johnson and Spencer that she had a gun.

The three girls arrived at the Silver Ball Too, a video arcade at Tenth & Hennepin in Minneapolis, and went across the street to the Speakeasy Bar, expecting to find Sorrell. Not finding her, they recrossed the street only to confront Smith, who expressed concern by saying, "I hope you ain't done any fucking with my woman."

A violent and obscene verbal exchange lasting about 10–20 minutes then took place between defendant and Smith, with Smith warning defendant to leave Sorrell alone and defendant warning Smith he wouldn't live to see the next day if he touched defendant. The security guard at the video arcade, Shawn D. Luedke, eventually told the parties to remove themselves from the front of the video arcade because it was attracting so much attention. Smith and defendant then moved their confrontation to the parking lot of the arcade and continued. Johnson testified that defendant said that if Smith "runs up on me, I'm going to take him out." and that Smith then said, "Man, fuck this. I'm going to my car and get my piece." According to Johnson, Smith then walked towards his car and was shot by defendant. After the first shot, Smith turned back towards defendant and said, "Oh, baby, why you doing that?" and began to run away. Defendant ran after him and shot Smith two more times.

Spencer testified that defendant began the argument with Smith by telling him that she had come downtown to beat up on his girl friend; that after an argument of 15–20 minutes, Smith spat on the ground in front of defendant and started to walk away; that defendant said "something smart," causing Smith to turn to come back; and that defendant pulled out her gun, smothered in a towel, and began firing at Smith. After the first shot, Smith turned and ran; but defendant chased him, firing two more shots at close range.

Richard Krueger, a car painter, also verified that Smith broke off the argument by going back towards his car, but that a remark by defendant caused Smith to go back towards defendant, who then pulled out a gun wrapped up in a rag. The gun misfired with three clicking sounds and then fired, hitting Smith, who turned and ran. Defendant shot him again. Smith fell to his knees near a billboard stanchion and defendant came up to fire two more times.

Luedke, the video arcade security guard, told basically the same story as Krueger. He said he saw defendant shoot Smith the

first time, saw Smith run towards the billboard, and then heard two more shots, but did not actually see them fired.

Another witness, Sally Mostrom, also testified that she heard the argument and heard defendant threaten to kill Smith. Mostrom said she saw Smith first walk away and then come back towards defendant when she shouted something at him, then saw defendant pull a gun, which clicked three or four times before a bullet discharged and hit Smith. Smith dropped to the ground and was helped towards the billboard by a friend, Freddie Washington. Defendant followed and shot Smith twice while he lay on the ground.

None of the witnesses at trial observed any weapon in Smith's possession. Defendant herself, in her statement to police, claimed that Smith threatened to get her so she got him first, but admitted her gun misfired at least once before discharging and hitting Smith and that she fired two or three times with Smith only 4 or 5 feet away. She said she wasn't sure Smith had a weapon, but he acted like he was going for one.

The report of the medical examiner was that Smith died from internal bleeding caused by one of two bullets, both of which hit him in the lower right side of his torso and traveled to his chest. The fatal bullet hit the *vena cava*, causing internal bleeding. The examiner was not able to say which bullet struck Smith first.

After the shooting, defendant drove around the block, picked up another passenger, William Redding, who played no part in the shooting, and headed for home. While driving, she gave the gun to Johnson with instructions to throw it away. Instead, Johnson put the gun in the car's glove compartment. Several miles away, defendant was stopped by a policeman for running a stop sign. Defendant got out of her car, met the policeman, and claimed to be lost. After checking her I.D. against a description being broadcast over the radio, the police made the arrest.

Defendant was indicted by a grand jury on counts of first- and second-degree mur-

der. On November 14, 1984, after her trial, the jury returned a verdict of first-degree murder. An appeal was filed on December 5, 1984. On May 21, 1985, Johnson, who was in Shakopee prison for unrelated reasons, made a statement to defendant's counsel, Mary C. Cade, to the effect that she had seen a gun in Smith's hand before the shooting, thus contradicting her own trial testimony. Another attorney, Susan Maki, listened to this conversation with Johnson's permission and signed an affidavit reporting the substance of Johnson's statements. On June 14, 1985, this court stayed the appeal in the case to allow defendant to file for post-conviction relief based on the new evidence. Such a petition was filed on July 16, 1985. After considering written argument, the trial judge denied the petition for post-conviction relief on January 3, 1986.

The issues raised by appellant are:

I.  Was there sufficient evidence to support the jury's verdict that defendant had committed first-degree murder?

II.  Did the jury instructions adequately explain the law concerning self-defense in the circumstances of this case?

III.  Is the appellant's proposed new evidence admissible?

## I.  *Sufficiency of Evidence*

■ In reviewing the sufficiency of evidence in a criminal case, this court makes a painstaking review of the record to determine if the evidence is sufficient to permit the jury to reach the conclusion that it did. *State v. Ellingson*, 283 Minn. 208, 167 N.W.2d 55 (1969). The court will not disturb the verdict if the jury, acting with due regard for the presumption of innocence and for the necessity of overcoming it by proof beyond a reasonable doubt, could reasonably conclude that a defendant was proven guilty of the offense charged. *State v. McCullum*, 289 N.W.2d 89 (Minn. 1979). The court considers the evidence in the light most favorable to the verdict and will assume that the jury disbelieved any testimony in conflict with the result it

reached. *State v. Oevering,* 268 N.W.2d 68 (Minn.1978).

The jury was given instructions on the crimes of first-degree and second-degree murder and first-degree manslaughter. In order to find the defendant guilty of first-degree murder, the jury was required to resolve three controverted evidentiary issues. If, as defendant claimed, her actions were in her own self-defense, then the killing was entirely excused, and the jury must find her not guilty. If the defendant acted in the heat of passion, provoked by the victim's actions, then her crime could only be that of manslaughter. Finally, if defendant killed Smith without premeditation, then she could only be guilty of second-degree murder.

### A. *Self-Defense*

The criteria for use of self-defense in a homicide case has been established to be that:

(1) The killing must have been done in the belief that it was necessary to avert death or grievous bodily harm.

(2) The judgment of the defendant as to the gravity of the peril to which he was exposed must have been reasonable under the circumstances.

(3) The defendant's election to kill must have been such as a reasonable man would have made in light of the danger to be apprehended.

*State v. Boyce,* 284 Minn. 242, 254, 170 N.W.2d 104, 112 (1969). Once the defendant raises the issue of self-defense, the state has the burden of proving that the defendant's actions in this case were not reasonable. *State v. Harvey,* 277 N.W.2d 344 (Minn.1979).

Defendant claims that she shot Smith because his statements and conduct put her in fear for her life. Thus, to overcome her claim of self-defense, the state must show that the defendant's judgment as to her peril was unreasonable or that she had reasonable alternatives to killing Smith such as would have saved her from danger.

The evidence does establish that a person in defendant's position would have had some reason to fear for her safety immediately before she shot Smith. Smith was a large, heavy man. He was angry and had threatened to hurt or kill defendant. Smith's occupation as a pimp and gambler probably gave these threats credence. Four of the five witnesses at trial—Spencer, Krueger, Luedke, and Mostrom—agreed that Smith was advancing towards defendant when he was shot. Moreover, Alice Johnson testified that Smith had said he was going to get his gun from his car, and other witnesses testified that Smith had reached the car and was about to get in before coming back towards defendant. Thus, defendant might have feared being faced with a gun.

However, the jury also had ample evidence demonstrating that Smith was not necessarily a threat to defendant's life. To begin with, there is not much evidence that defendant actually was in imminent danger of harm when she shot Smith. There is no evidence that her peril at that time was any graver than it had been during the previous 10–20 minute argument when defendant had been spat upon, threatened and cursed. If defendant had real reason to feel danger during that time, it would have been unreasonable for her to continue the argument against the advice of her friends that she leave.

If Smith actually had had a gun when he turned towards her, then her danger would have been great. However, no witness at trial saw any gun, and defendant's own statements on that point were equivocal. In her first statement to the police, she said, "I think he did have something, but I don't know if I saw it or not. But I think he did have something, because when he went in his car ... (inaudible)." A couple of hours later, she said, "I don't know [if he had a weapon], but it looked like he was going for one." In fact, the evidence is divided as to whether Smith ever had a gun. Defendant claims that Smith had pulled one on her earlier at the Elks. Johnson, also at the Elks, saw no weapon. Other witnesses testified they had never seen Smith with a gun or a knife.

Conceivably, the jury could have determined that the threatening approach of Smith, in and of itself, could be enough to make defendant reasonably afraid that her life was in peril, but the jury was not compelled to reach such a conclusion.

Defendant's argument is even weaker with regard to the third requirement for self-defense—that defendant's election to kill Smith must have been such as a reasonable person would have made in light of the danger apprehended.

According to the evidence, defendant was standing on the sidewalk near the entrance to the parking lot when she fired her first shot at Smith who was near his car in the parking lot. There was no obstacle to her running up or down the sidewalk or, possibly, back across Hennepin Avenue. Conceivably, Smith could have run after her, but defendant never tested that possibility. Instead, she stood her ground and fired while Smith was 5–10 feet away.

Furthermore, there is significant evidence that defendant was not in danger at the moment she actually shot Smith. Two witnesses, as well as defendant herself, stated that defendant's gun misfired at first, three or four times, before defendant took off a white towel and fired her first shot. Witnesses testified that, while she was attempting to shoot him, Smith saw the gun in her hand, stopped walking towards her and began to turn around, preparing to flee. The evidence is that both bullets entered the lower side of Smith's body and then traveled through his body towards his chest, showing that they had been fired when Smith was half-turned from defendant. All the witnesses who saw what happened after the first shot agreed that defendant chased after Smith and shot at him twice more. One of the bullets apparently missed, the other hit Smith while he was kneeling or crouched. It was only then that defendant chose to leave.

In short, whatever the initial threat posed by Smith advancing towards her, defendant chose the most violent means possible to meet the problem and continued her actions appreciably after the time Smith posed any danger. On these facts, the jury had more than sufficient evidence to find that the homicide was not justified by self-defense.

### B. *Heat of Passion*

Defendant also argues that there was insufficient evidence to exclude a verdict of first-degree manslaughter and, thus, that this court must reduce the murder conviction to manslaughter. *See State v. Gibbons*, 305 N.W.2d 331 (Minn.1981).

A homicide is first-degree manslaughter when it is performed intentionally "in the heat of passion provoked by such words or acts of another as would provoke a person of ordinary self-control under like circumstances." Minn.Stat. § 609.20(1) (1984). Defendant claims she was angered by the victim's behavior and also afraid, both emotions disabling her power to reason. Though defendant was clearly angry during the argument that led up to the shooting, the evidence was that this anger was no sudden heat of passion but, instead, simply part of an on-going sense of outrage. Moreover, though Smith spat at defendant, cursed and threatened her, the jury could reasonably have decided that none of these actions were ordinarily provocative of such blind rage as might mitigate defendant's offense.

Alternatively, defendant argues that, because of the previous vicious argument and her belief that he was reaching for a weapon, the approach of Smith—a large, heavy man—provoked in her such fear that she was incapable of thinking rationally and fired in blind panic. In effect, defendant is arguing that, even if her fear were not reasonable enough to justify self-defense, it was real enough in her own mind at the time she shot Smith.

Defendant can find support for this theory in the case of *State v. Boyce*, 284 Minn. 242, 170 N.W.2d 104 (1969). In that case, we said:

[T]he evidence and the inferences reasonably to be drawn therefrom may be sufficient to warrant the jury in concluding that, though the killing was not justifiable under a plea of self-defense, it was done under such circumstances as to reduce the offense to voluntary manslaughter. * * * "The dividing line between self-defense and this character of manslaughter seems to be the existence, as the moving force, of a reasonably founded belief of imminent peril to life or great bodily harm, as distinguished from the influence of an uncontrollable fear or terror, conceivable as *existing, but not reasonably justified* by the immediate circumstances. If the circumstances are both adequate to raise, and sufficient to justify, a belief in the necessity to take life in order to save oneself from such a danger, where the belief exists and is acted upon, the homicide is excusable upon the theory of self-defense * * * while, if the act is committed under the influence of an uncontrollable fear of death or great bodily harm, caused by the circumstances, *but without the presence of all the ingredients necessary to excuse the act on the ground of self-defense*, the killing is manslaughter."

*Id.* at 114 (quoting from *People v. Best*, 13 Cal.App.2d 606, 57 P.2d 168, 169–70 (1936)) (citations omitted).

Under the analysis suggested by *Boyce*, the question is not whether the circumstances would lead a reasonable person to kill in defense of his or her life, but whether the evidence demonstrates defendant actually felt an unreasonable fear such as would provoke her to shoot.

This court faced a similar question in *State v. Salas*, 306 N.W.2d 832 (Minn. 1981), where the defendant, convicted of first-degree murder, argued that the victim's action of reaching into his shirt as if for a gun provoked the fear that caused him to shoot. The court found that this was a plausible argument, but that the jury's verdict was justified given that the victim was unarmed.

The mere fact of prior threats from the deceased, and the fact that the deceased reached into his shirt shortly before the shooting, do not compel a verdict of manslaughter instead of second-degree murder. The provocation defense wanes even further in view of the evidence that defendant fired a second shot into [the victim's] head, then started kicking him, and even after that, continued to beat his victim with a board.

*Id.* at 838.

Similarly, there was little evidence that defendant was panicked into unreasonable fear by Smith. Smith had no weapon and defendant had spent, at least, 10–20 minutes arguing with Smith without demonstrating much fear. According to Johnson, defendant had even made a plan that if Smith "runs up on me," she would "take him out." Furthermore, defendant's decision to chase after Smith and continue shooting indicates hate instead of terror. The jury thus had sufficient evidence to rule out manslaughter.

## C. *Premeditation*

Finally, defendant argues that there was insufficient evidence that the killing was premeditated, requiring a reduction of the verdict to second-degree murder. According to statute, premeditation means "to consider, plan or prepare for, or determine to commit" an act before its commission. Minn.Stat. § 609.18 (1984). Premeditation is a subjective element of a crime and must be inferred from the totality of the circumstances. *State v. Lloyd*, 345 N.W.2d 240, 245 (Minn.1984). Premeditation does not require extensive planning, but "could well [be] formed in those moments of hostile confrontation between [a] defendant and decedent." *Lloyd*, 345 N.W.2d at 246 (1984) (citation omitted). Mere evidence that a series of shots or blows killed the victim does not suffice to show premeditation. However, evidence that there was a period of time between shots can demonstrate premeditation. *Lloyd*, 345 N.W.2d at 246.

■ In this case, the evidence is that defendant carried a gun with her to the Silver Ball Too specifically to protect herself in a possible confrontation against Smith. She threatened to kill Smith during her argument with him and also confided a plan to Johnson to kill Smith if assaulted. Although the shots that killed Smith came in rapid succession and, initially, in reaction to Smith's movement, defendant had to make the decision to chase after Smith and fire the last two or three shots. These are sufficient circumstances for the jury to have found premeditation.

We thus find there was sufficient evidence to convict defendant of first-degree murder.

## II. *Jury Instructions*

Defendant argues that the judge erroneously refused to instruct the jury that actual danger is not required to justify a killing in self-defense. A basic argument of the defense at trial was that defendant reasonably felt herself to be in great danger from Smith. Defendant is concerned that the jury might have believed that defendant could only claim self-defense if Smith actually had a gun or some other weapon.

■ This court has held that self-defense instructions must be given with precision. *State v. Malaski,* 330 N.W.2d 447 (Minn.1983) (in error to instruct on a defendant's "election to kill" victim where defendant had never admitted to intention to kill, but only intention to shoot). Furthermore, a party is entitled to a particular jury instruction if the evidence supports it. *State v. Schluter,* 281 N.W.2d 174 (Minn. 1979). However, " '[t]he court need not give the instruction as requested by the party if it determines that the substance of that request is contained in the court's charge.' " *Id.* at 177 (quoting from *State v. Ruud,* 259 N.W.2d 567, 578 (Minn.1977).

■ In this case, the judge instructed the jury that defendant's actions were justified if taken in resisting action "which she *reasonably believe[d]* expose[d] her * * * to death or great bodily harm."

(Emphasis added.) Twice more in the instructions, the court noted that it was defendant's judgment or belief that was significant in assessing her claim to self-defense. In his own closing argument, the prosecutor also noted that the test was whether defendant's fear was a reasonable one and whether there were factors to convince her that she was in reasonable fear. There was no attempt to imply that actual danger was necessary.

What defendant desired was to have the law concerning a defendant's reasonable belief of harm amplified so as to emphasize her argument that no actual harm was required. While such an amplification might have been acceptable, it was unnecessary since the substance of defendant's position had already been stated. *See, e.g., State v. Molin,* 288 N.W.2d 232 (Minn.1979) (no need to instruct specifically on possibility of accidental killing in trial of a homicide since point was already covered in general instructions on intent).

We find the judge's instructions to be acceptable and proper in this case.

## III. *Post-Conviction Relief*

Six months after the trial, while imprisoned at Shakopee for unrelated reasons, Johnson, in a phone call, told defendant's lawyer, Mary C. Cade, that she had lied while giving testimony. According to the affidavit of Susan Maki, who listened with permission to the phone conversation between Johnson and Cade, Johnson stated that there had been an object in Smith's hands which Johnson assumed to be a gun since it was "too big to be a knife." This statement directly contradicted Johnson's testimony at trial that she had not seen any object in Smith's hand.

Defendant argues that this new evidence compels a new trial to reassess defendant's verdict in light of Johnson's claimed perjury.

## A. *Admissibility of the New Evidence*

Before the affidavit could have any effect, it must first be found to be admissible evidence. However, in the form presented,

Johnson's recantations are only hearsay. According to Minn.R.Evid. 804(b)(3), hearsay is admissible if the declarant is unavailable and the hearsay is:

A statement which * * * at the time of its making so far * * * tended to subject [the declarant] to * * * criminal liability, * * * that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

■ Johnson stated that she would plead the Fifth Amendment if questioned concerning her change in testimony. Thus, she is unavailable for purposes of Rule 804(b)(3). Minn.R.Evid. 804(a); *State v. Renier*, 373 N.W.2d 282 (Minn.1985).

■ The admissibility of the affidavit thus rests on the resolution of two issues: First, whether admitting to perjury exposed Johnson to criminal liability to such an extent as to make it likely her recantation is true and, second, whether there are corroborating circumstances demonstrating the trustworthiness of the recantation.

The state argues that Johnson's declaration did not subject her to such obvious danger of criminal liability as to guarantee its truthfulness. The state notes the unlikelihood that Johnson will be tried for perjury given the absence of any independent evidence that Johnson's trial testimony was false and the fact that Johnson will not testify further on the subject.

Johnson's motivations for recanting should be assessed from her viewpoint of the possible consequences of doing so, not by whatever use the state actually intends to make of the new information. Johnson knew that her statement made a perjury indictment possible. Yet, even Johnson must have realized that her chances of suffering any further criminal punishment from her recantation were small. She specifically stated that "she would not be willing to testify in Petitioner's behalf if the possibility of her being charged with perjury existed." There is no evidence that Johnson felt any concern that her recantation put her in any real or present danger of being charged with perjury.

Moreover, there still remains 804(b)(3)'s requirement that recantations be corroborated by circumstances clearly indicating trustworthiness. This court has carefully scrutinized the genuineness of previous recantations sought to be admitted under 804(b)(3). In *Renier*, the sister of a convicted murderer was overheard recanting her trial testimony and taking the blame as the one who really plotted the death of the defendant's husband. The recanting sister pleaded the Fifth Amendment when formally questioned about her change in testimony.

This court rejected the proffered testimony, noting several indications of spuriousness, some of which are applicable in the present case. First, the sister's recantation testimony was inconsistent with other testimony of witnesses in the case. Moreover, the recanting sister had never gone to the authorities with the information and, as the defendant's sister, had a motive to fabricate.

The recantation of Johnson has even less to recommend it than the recantation rejected in *Renier*. First, like the person recanting in *Renier*, Johnson refuses to go to the authorities with her information. Second, although she does not have familial ties with defendant such as might have motivated the recanter in *Renier* to lie for her condemned sister, Johnson is now locked up with defendant in Shakopee prison, at least giving the defendant the opportunity to persuade or coerce her friend into lying on the defendant's behalf.

More importantly, Johnson's recantation contradicts her own trial testimony and is also inconsistent with the evidence given by nearly every other witness. According to the affidavit, Johnson saw a weapon in Smith's hand, panicked, dropped her head and fled to the car. This statement not only contradicts Johnson's previous testimony at trial that there wasn't anything in

Smith's hands, it is also inconsistent with other parts of Johnson's previous testimony. If Johnson dropped her head and fled when seeing Smith with a weapon, as stated in her affidavit, she would have been in no position to see Smith run after being shot or see him turn and say, "Oh, baby, don't do that." or to see defendant follow him and shoot two more times as she testified at trial. Johnson claims that she lied at trial because of pressure from Smith's friends, but there is no apparent reason for her to have fabricated so many details of her trial testimony.

Not only is the affidavit shaky on its own terms, it is also flatly contradicted by every other witness to the shooting. Spencer, Krueger and Mostrom all stated that they did not see any object in Smith's hands before the shooting. Even the defendant is equivocal on the issue. No witness mentioned that Johnson fled before there was shooting. Instead, Luedke said everyone cleared out *after* the first shot. In her affidavit, Johnson specifically attempted to discredit Mostrom's testimony by saying Mostrom wasn't at the shooting. However, Mostrom's testimony is reasonably detailed and generally consistent with the evidence given by other witnesses.

All that defendant can point to in corroboration of Johnson's recantation is the plausibility that Johnson was pressured to lie at trial. Johnson claimed in her affidavit that she had previously denied Smith had a gun because of threats from Smith's friends, Frank and "Blue."

It is undisputed that Smith was a pimp and a gambler and made threats of violence against defendant. However, apart from Johnson's statement, there is no evidence that Smith's friends threatened violence to coerce her testimony. It may be consistent with Smith's character to have such friends, but such speculation is not a corroborating circumstance.

We thus uphold the trial court order denying admission of the affidavit on the grounds that there are insufficient corroborating circumstances indicating that the recantation is trustworthy. Alternatively,

given the improbability that Johnson would be indicted for perjury under the circumstances, her declaration is not sufficiently contrary to her penal interest to make it reasonably likely to be true.

The trial court is affirmed in all respects and the conviction is upheld.