STATE of Minnesota, Respondent,

v.

Lionel S. BUCHANAN, Appellant.

Nos. C2–87–2498, C7–88–62.

Supreme Court of Minnesota.

Nov. 23, 1988.

Susan K. Maki, Asst. State Public Defender, Minneapolis, for appellant.

Vernon E. Bergstrom, Atty. General's Office, St. Paul, and Beverly J. Wolfe, Asst. Co. Atty., Minneapolis, for respondent.

POPOVICH, Justice.

Defendant was convicted of first-degree murder in a jury trial in Hennepin County District Court. Defendant appeals to this court, claiming (1) evidence adduced at trial was insufficient as a matter of law to sustain his conviction; (2) evidence of defendant's alcohol consumption established his incapacity to premeditate or form the requisite intent; (3) the evidence established as a matter of law the homicide was committed in self-defense or in the heat of passion; (4) admission of the videotaped interview defendant gave police was an abuse of discretion; (5) the trial court's refusal to admit certain evidence offered by the defendant unconstitutionally denied him the opportunity to present a defense; and (6) defendant's right to effective assistance of counsel was denied because the public defender failed to zealously defend him. We affirm.

I.

On the evening of June 11, 1987, the defendant shot Larry Whisby four times in the apartment parking lot where defendant resided with his girlfriend, at 1221 Banneker Avenue in north Minneapolis. The victim died as a result of exsanguination (blood loss) from two of the wounds he suffered. The entrance of two wounds showed signs of stippling, indicating close proximity of the firearm during discharge. One of the "stippled" wounds was a lethal injury.

On that day between noon and 3:30 p.m. defendant left the apartment building with his friend Pat Kelly, who also resided there. The two intended to purchase beer. Meeting a group gathered outside the building who were of like mind, defendant and Kelly joined them, pooling their money for two collective alcohol purchases. Robert Thames, a friend of defendant, testified the group probably drank about two beers each from the first purchase. Neither Thames nor the defendant could say, however, how much Whisby or the defendant actually drank. The second purchase consisted of a 12-pack and a fifth of wine for the 13-17 person group. Defendant also testified he spent much of the previous evening drinking about 32 beers, but this testimony was not corroborated.

During the course of the afternoon Whisby and defendant began to have words, which lasted off and on for several hours. Defendant testified the argument started when Whisby "boguarded" (took without permission) a bottle of beer, which led to name-calling. Defendant testified Pat Kelly suggested they go and get their own beer and sit by themselves, which they did, additionally buying wine coolers for their girlfriends. Initially Kelly, defendant and Velma Nelson, defendant's girlfriend, were in front of the building on the railing. Whisby continued with the argument, using profanity.

Defendant testified Whisby asked for a drink and, when refused, threatened the defendant and was "talking crazy." Whisby called him a "punk m___f___," threatened to take a drink, and swung at defendant, who ducked. Whisby fell against some cars as a result of the errant swing. Defendant's group then moved to the stoop on the side of the building. Whisby followed them and continued arguing and shouting.

Whisby returned to the other side of the parking lot about the time Thames and Darren Johnson drove up. Whisby went to the car and, according to Thames, beat on the hood and spoke with Thames. Whisby said, "These guys don't know me, man. They're f___ with me. * * * I'm going to do something to him."

At this point, according to Velma Nelson's testimony, defendant told her to go to their apartment and get a gun, which she did. When Nelson returned she laid the gun on the stoop. Three or four minutes after Nelson returned with the gun, Whisby started back to the stoop. Thames unsuccessfully tried to dissuade Whisby from approaching defendant, and even tried three times to physically prevent Whisby from leaving the area of the car. Whisby, a big man, was not deterred from confronting the defendant and twice lifted Thames out of his way and set him on the car. Finally, Whisby simply swung Thames to the ground, causing Thames' glasses to slip off. Witnesses testified Whisby began walking quickly toward defendant. All the witnesses agreed that during his approach he was shirtless and had no weapons in his hands or visible on his person. As Whisby approached, Nelson heard him say, "I'm going to kill some niggers and poo butt punks * * *." Defendant also heard Whisby say he was going to kill someone.

Some witnesses testified defendant got up from the stoop and walked toward the approaching Whisby. Other witnesses reported the defendant merely stood, then shot Whisby. Both Thames and Darren Johnson, the driver of the car, testified defendant walked toward Whisby with the gun behind his back, produced the gun, and fired. Johnson reported, as did several other witnesses, that the victim stopped when defendant produced the gun and asked or indicated with his hand that defendant not shoot. The defendant then shot the victim twice. The first shots came close together in time.

After the second shot, Whisby fell to the ground. Thames shouted to defendant he didn't need to shoot Whisby, whereupon defendant turned and pointed the gun at Thames. He then walked closer to the fallen Whisby and fired two more shots into him as he walked around his body. Before the third shot, several witnesses heard the victim ask, or indicate by hand gestures, that defendant not shoot again. Darren Johnson testified defendant asked the fallen Whisby, "What are you going to do now?" before firing the third and fourth shots and leaving the scene.

Officer Kimberly Lund testified she found Whisby's body 30–40 feet from the stoop. The jury also received a scale drawing of the parking lot and surrounding buildings, showing the exact location of the pools of blood from the victim's body relative to the buildings.

On June 14, 1987, between 5:00 and 5:30 a.m., three days after the shooting, defendant flagged down a squad car and asked if he was wanted for questioning. Officer Nelson, the driver, noticed that defendant smelled of alcohol, his speech was disjointed, and he appeared nervous. Officer Nelson admitted at trial that earlier he had said, "[O]bviously he was intoxicated from the night before." The officer in fact stated at the Rasmussen hearing that the defendant, at the time he flagged down the squad, "was obviously still under the influence from the night before * * *."

Officer Nelson took the defendant to Minneapolis Police Headquarters where he was interviewed by Lt. Keith Davidson. The interview was recorded on videotape without the defendant's knowledge. This video was shown to the jury at trial. During the interview defendant stated that on the night of the shooting he was drunk. He immediately corrected himself, however, and said he was drinking but not drunk. Defendant also said while he knew what was happening, he couldn't believe it. He added he could clearly see and hear what was happening. At the end of the interview defendant was asked about his physical condition and reported that it was fine. He was also asked about his alcohol consumption and said that on the previous day he had drunk two pints and twelve cans of beer, but his last drink was at 1:00 a.m.

## II.

■ First degree murder under Minn. Stat. § 609.185(1) (1986) occurs when a person causes the death of a human being with premeditation and with intent to effect the death of such person. *State v. Lloyd*, 345 N.W.2d 240, 244 (Minn.1984). Defendant raises claims of insufficiency as to elements of premeditation and intent. Defendant also raises a claim of insufficiency as to the state's burden to prove his acts were not justified, under Minn.Stat. §§ 609.06 (1986) and 609.065 (1986), or provoked, as described in Minn.Stat. § 609.20 (1986).

## III.

■ The standard of review of a jury conviction in an insufficiency-of-evidence appeal is whether, viewing the evidence and any reasonable inferences that could be drawn therefrom in a light most favorable to the state, the jury could reasonably find the defendant guilty beyond a reasonable doubt. *State v. Bias*, 419 N.W.2d 480, 484 (Minn.1988); *State v. Wahlberg*, 296 N.W.2d 408, 411 (Minn.1980). In conducting this review, the court assumes the jury believed the state's witnesses and disbelieved evidence to the contrary. *Wahlberg*, 296 N.W.2d at 411. The jury determines the credibility and weight to be given the testimony of witnesses. *Bias*, 419 N.W.2d at 484. It is in light of this standard of review that we examine defendant's claims.

### Intent

■ Defendant argues there was insufficient evidence to establish an intentional killing. In *State v. Bryant*, 281 N.W.2d 712, 714 (Minn.1979), we said a jury could reasonably find an intent to kill where the evidence showed multiple gunshots, the last two coming at close range. In this matter there were four gunshot wounds. The second set of shots came after a short pause and after defendant approached and walked around the fallen victim. The jury could reasonably have concluded, based on the testimony of the medical examiner and Officer Drake Powers regarding the proximity of a firearm necessary to cause stippling, that defendant's last shots were at a distance of less than three feet. From the number of shots fired and the close proximity of the final two shots, the jury, with due deference to the presumption of innocence, could reasonably have concluded the defendant intended to kill Larry Whisby.

### Premeditation

■ Premeditation means "to consider, plan or prepare for, or determine to commit" the act in question prior to its commission. Minn.Stat. § 609.18 (1986); *Wahlberg*, 296 N.W.2d at 415. Premeditation "indicates a preexisting reflection and deliberation involving more than a mere intent to kill." *Lloyd*, 345 N.W.2d at 245. The requisite plan can be formed, however, virtually instantaneously. *Wahlberg*, 296 N.W.2d at 415. Premeditation must usually be inferred from the totality of the circumstances surrounding the crime. *Id.; Lloyd*, 345 N.W.2d at 245.

■ In this case, the jury could reasonably have found, or inferred: (1) defendant asked Velma Nelson to get the gun; (2) he hid the gun behind his back while he advanced to meet the victim; (3) he withdrew the gun and fired twice; (4) he paused briefly to aim the gun at Robert Thames; and (5) he then walked up to where Whisby had fallen, walked around him, and fired two more shots at a range of less than three feet. Finally, before firing the shots, defendant was heard to ask Whisby, "What are you going to do now?" We have said that where a defendant deliberately arms himself and runs across a street to shoot a victim, premeditation may be inferred. *State v. Amos*, 347 N.W.2d 498, 501 (Minn. 1984). The behavior of this defendant, in arming himself and advancing to meet Whisby, is similar to that of the defendant in *Amos*.

Defendant's act of hiding the gun behind his back suggests a deliberate effort to get closer to Whisby before firing, which in turn suggests a plan to kill him. Defendant's question to Whisby, as he lay wounded on the ground, gives rise to a reasonable inference that defendant fully appreciated the helplessness created as a result of his

first two shots. Thus, defendant's second set of shots could reasonably be viewed as a conscious effort to complete the killing.

In two recent cases we held that where first shots are followed by a pause and second shots, an inference of premeditation is proper. *See State v. Richardson,* 393 N.W.2d 657, 664 (Minn.1986); *Lloyd,* 345 N.W.2d at 246. Thus, there appears to be ample evidence from which the jury could reasonably conclude premeditation was present beyond a reasonable doubt.

### *Justification and Self–Defense*

 Minn. Stat. §§ 609.06 and 609.065 excuse the intentional killing of another if these elements occur:

(1) The killing must have been done in the belief that it was necessary to avert death or grievous bodily harm.

(2) The judgment of the defendant as to the gravity of the peril to which he was exposed must have been reasonable under the circumstances.

(3) The defendant's election to kill must have been such as a reasonable person would have made in light of the danger to be apprehended.

*Richardson,* 393 N.W.2d at 662 (citing *State v. Boyce,* 284 Minn. 242, 254, 170 N.W.2d 104, 112 (1969)). In Minnesota one also has a duty to retreat to avoid danger, if reasonably possible. *State v. Austin,* 332 N.W.2d 21, 24 (Minn.1983). Once a defendant raises a claim of self-defense, the burden is on the state to prove beyond a reasonable doubt that the killing was not justified. *State v. Housley,* 322 N.W.2d 746, 750 (Minn.1982). The state may do this by proving the nonexistence of any of these elements. *See Richardson,* 393 N.W.2d at 662.

Elements (2) and (3) are essentially objective tests, while element (1) is a measure of the defendant's subjective mental state. The duty to retreat does not refer to a mental state.

 The jury in this case could reasonably have found or inferred: (1) one of the second set of shots was a mortal wound, which, based on the medical examiner's tes-timony, hastened death; (2) the defendant shot Whisby again as he lay weaponless on the ground; (3) no visible threat was posed to the defendant after Whisby fell to the ground following the second shot; (4) the defendant paused for at least 30 seconds after the first two shots before shooting two more times. Given these facts, the jury could reasonably have concluded that following the first set of shots no reasonable person would have believed any peril to the defendant existed, much less life-threatening peril, and no reasonable person would have elected to kill when faced with a fallen and wounded attacker.

Recently, in *Richardson,* we examined the self-defense argument in terms of the objective peril which existed after a first shot but prior to a second volley. There, the defendant was faced with a possibly threatening attacker and shot the attacker once and then chased him a short distance and shot him twice more after he had fall-en. *Richardson,* 393 N.W.2d at 660–61. In upholding a jury conviction of first-degree murder, we said:

> In short, whatever the initial threat posed by [the attacker] advancing to-wards her, defendant chose the most violent means possible to meet the problem and *continued her actions appreciably after the time [the attacker] posed any danger.*

*Id.* at 663 (emphasis added). Thus, here the jury could reasonably have concluded elements (2) and (3) did not exist after the first set of shots, regardless of what conditions existed prior to them.

Finally, the jury could reasonably have concluded defendant did not fulfill his duty to retreat if possible. The evidence demonstrates defendant was twice asked to leave in order to avoid further conflict, but refused. The jury could also have found the defendant, instead of retreating, went to meet Whisby and thereby insured a conflict would ensue. There was ample evidence from which the jury could reasonably have concluded the state proved defendant was not justified in killing Whisby.

## Heat of Passion

■ An intentional killing may be mitigated to first-degree manslaughter if (1) the killing was done in the heat of passion, and (2) the passion was provoked by words and acts of another such as would provoke a person of ordinary self-control under like circumstances. *Boyce*, 284 Minn. at 254, 170 N.W.2d at 112; *see* Minn.Stat. § 609.20(1) (1986); *Richardson*, 393 N.W. 2d at 663. As *Boyce* makes clear, two elements are contained in a heat-of-passion defense. The first element is subjective and the second is objective.

■ Defendant argues that, where he has failed to establish all the elements necessary for self-defense, the conviction must nevertheless be reduced to first-degree manslaughter if the evidence shows he was genuinely frightened when he acted. Defendant relies on *Boyce*, which distinguishes self-defense and heat of passion. Defendant argues that *Boyce* holds where some of the elements for a self-defense claim are missing, an accused can still make out a claim for heat of passion if he was genuinely frightened at the time of the event.[1]

Defendant's argument misstates the conclusion of *Boyce*. *Boyce* explicitly states there are two elements in a heat-of-passion claim. *Boyce*, 284 Minn. at 254, 170 N.W. 2d at 112. As noted, one of these elements is an objective test. Nothing in *Boyce* stands for the proposition that an accused's genuine fear or terror, standing alone, will mitigate murder to manslaughter. *Boyce* states the conduct in question must be sufficient to provoke a person of ordinary self-control. *See Boyce*, 284 Minn. at 254–58, 170 N.W.2d at 112–14; *see also State v. Salas*, 306 N.W.2d 832, 837–38 (Minn.1981) (jury justified in finding person of ordinary self-control would not have been provoked).

The trial court's jury charge reflected this standard. Both the heat of passion and justification statutes evince a legislative intent to excuse or mitigate a homicide where a defendant behaves as would a reasonable person. We resist the invitation to fashion a new defense which the legislature has not seen fit to mandate. The state could reasonably be said to have proved beyond a reasonable doubt that a person of ordinary self-control would not have been provoked to kill by the acts of Larry Whisby. *See generally Richardson*, 393 N.W.2d at 664 (defendant's decision to pursue attacker after first shot indicated hate, not terror, thus heat of passion was properly rejected).

## Alcohol

■ Defendant argues he was incapable of forming the necessary intent and premeditation at the time of the killing due to his intoxication. Minn.Stat. § 609.075 (1986) provides that voluntary intoxication may be taken into consideration in determining whether a particular intent or state of mind existed at the relevant time. It is the defendant's burden to establish such intoxication by a fair preponderance of the evidence. *Wahlberg*, 296 N.W.2d at 418. The question of intoxication is one for the finder of fact. *State v. Neumann*, 262 N.W.2d 426, 431 (Minn.1978). "[A]s long as the record contains sufficient evidence to support the conclusion reached by the finder of fact on the intoxication issue, this court will not reverse that conclusion despite the existence of some evidence to the contrary." *Id.* at 432.

■ While testimony at trial established all the concerned parties were drinking, it is far from clear how much the defendant consumed. The defendant testified having consumed a large amount of beer in the 24 hours prior to the incident.

---

1. The public defender, in a letter filed with the court one week before oral argument, cites *People v. Flannel*, 25 Cal.3d 668, 160 Cal.Rptr. 84, 603 P.2d 1 (1980), in support of the proposition that genuine fear, even if unreasonable, may mitigate murder to manslaughter. In *Flannel*, the California Supreme Court recognized unreasonable fear as a separate defense apart from justification and heat of passion. *Flannel*, 25 Cal.3d at 677, 160 Cal.Rptr. at 88, 603 P.2d at 5. The California court said a genuine but unreasonable fear was inconsistent with malice aforethought, a necessary element for a murder conviction. *Id.* at 679, 160 Cal.Rptr. at 90, 603 P.2d at 7. Defendant cites no Minnesota case supporting this proposition and did not discuss the applicability of the case at oral argument.

Most of that testimony, however, is uncorroborated, and the jury may properly have viewed it as self-serving. *Neumann*, 262 N.W.2d at 432.

Defendant argues the testimony of Velma Nelson established he was intoxicated. Nelson's testimony was equivocating. At one point during trial she described defendant as having been "pretty intoxicated." Almost immediately, Nelson, having been reminded of her conflicting out-of-court statements, described defendant as "just say high off the liquor." Robert Thames admitted on cross-examination that he believed himself, Whisby and defendant to be equally intoxicated. Thames earlier had described that state as high, or mellow.

Evidence suggesting defendant's sobriety, or least non-intoxication, was presented. First, defendant's memory of the incident was fairly detailed except for two facts: how the gun appeared, and the second set of shots. This selectivity has been held to support a conviction of felony murder despite a claim, and evidence, of alcohol and drug consumption. *See In re Matter of Welfare of M.D.S.*, 345 N.W.2d 723, 735 (Minn.1984). Additionally, there is the glaring lack of testimony from the defendant himself that he was drunk or intoxicated. This is undoubtedly due to defendant's admission in the video interview with Lt. Davidson that he was drinking, but was not drunk. The jury was shown the videotape of this interview.

We have stated, "The mere fact of a person's drinking does not create a presumption of intoxication, and the possibility of intoxication does not create the presumption that a person is incapable of intending to commit a certain act." *Wahlberg*, 296 N.W.2d at 418. Given the law's refusal to create presumption *vis a vis* intoxication and incapacity, and given the evidence presented, the jury's implicit finding that the defendant did not carry his burden of proving incapacity due to intoxication is reasonable.

### IV.

#### Evidentiary Claims

Defendant makes three evidentiary claims. Two of these were offers made by the defense and excluded by the court. The last claim deals with the admission of the videotape interview, which defendant claims was not conducted pursuant to a voluntary waiver of his rights.

1. Defendant claims the court's exclusion of testimony he would have offered if allowed, regarding his prior witnessing of street violence in other cities, prevented him from exercising his constitutional right to present a defense. Defendant contends this testimony was relevant to establishing his state of mind at the time he elected to use deadly force against Whisby.

■■■ The trial court has wide discretion in determining the relevancy of evidence. *State v. Swain*, 269 N.W.2d 707, 714 (Minn. 1978). Moreover, even if exclusion of the evidence did violate defendant's constitutional right to present a defense, the decision still will not be reversed if it is found harmless beyond a reasonable doubt. *State v. Larson*, 389 N.W.2d 872, 875 (Minn.1986) (citing *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). A ruling is prejudicial and reversible if there is a reasonable possibility the error complained of may have contributed to the conviction. *Id.*

■■■ The testimony defendant offered at trial may not be totally irrelevant to his apprehension of Whisby when he threatened to kill the defendant. The probative value of such evidence, however, is far less than the value of evidence of Whisby's belligerent behavior and the direct testimony of the defendant's state of mind, both of which were admitted. Nevertheless, the defendant's constitutional right to give testimony regarding his intent and motivation is very broad. *See State v. Brechon*, 352 N.W.2d 745, 751–52 (Minn.1984) (Wahl, J., concurring). This right is not without limitation, however, and must be balanced against interests served by imposing strict relevancy requirements on the defendant's testimony. *Rock v. Arkansas*, 483 U.S. 44, 107 S.Ct. 2704, 2711, 97 L.Ed.2d 37 (1987).

Minn.R.Evid. 403 excludes evidence which is relevant but whose probative value is substantially outweighed by the danger of unfair prejudice, confusion, undue delay and waste of time, or needless presentation of cumulative evidence. The evidence of prior street violence, while slightly probative of defendant's state of mind, runs afoul of Rule 403, whose purpose is to enhance the truth-seeking process by presenting only evidence which is probative and will lead to a rational and impartial decision and promote judicial economy. See Weinstein, *Evidence* ¶ 403[.01] pp. 403–13, n. 11, 403–16, n. 14 (1988). The balance to be struck weighs the harm to defendant's case posed by exclusion against the threat posed to the goals represented in Rule 403. *See Rock*, 483 U.S. at ——, 107 S.Ct. at 2711–12. In this case, the harm done to the defendant's case is virtually nonexistent as the evidence excluded was of doubtful probative value and merely duplicated other evidence already presented by the defendant.[2] The threat posed to goals of Rule 403 appears direct. The proffered evidence was cumulative and delaying. The application of Rule 403 in this case was constitutional.

Even if it was error to exclude some or all of the testimony regarding prior street violence, that testimony was duplicative of testimony already in evidence. Moreover, the testimony excluded does not really illuminate the issue of how a reasonable person of ordinary self-control would have reacted in like circumstances, especially after the first set of shots was fired. Thus, the error, if any, appears harmless.

2. The defendant argues the exclusion of evidence of Whisby's prior trespass notice, received when the victim was intoxicated, was reversible error. Defendant asserts such evidence was probative of who was the aggressor in the conflict leading to the shooting.

Defendant argues this evidence was necessary to prove Whisby was the aggressor. The admissibility of such evidence is controlled by Minn.R.Evid. 404(a)(2), which governs evidence of a victim's character offered to prove the victim was the first aggressor, *see State v. Bland*, 337 N.W.2d 378, 382 (Minn.1983). The victim's character may be proved by methods prescribed in Minn.R.Evid. 405. *Id.* at 383. Rule 405(b) governs offers of specific instances of conduct, as in the instant case. "Rule 405(b) cannot be relied upon as justifying admission of specific evidence of prior acts of violence by the victim in a criminal case in which the defendant claims self-defense." *Id.* Thus, the evidence was properly excluded.

3. Defendant in his *pro se* supplemental brief asserts the videotaped interview should not have been admitted because it did not follow a knowing, intelligent and voluntary waiver of the defendant's constitutional rights per *Miranda v. Arizona*, 384 U.S. 436, 476–80, 86 S.Ct. 1602, 1628–31, 16 L.Ed.2d 694 (1966). Though a "Miranda" warning was read to defendant and he indicated he understood his rights, defendant argues he lacked capacity to give a knowing and intelligent waiver due to his intoxication. Officer Nelson said at both the Rasmussen hearing and at trial that the defendant had a strong smell of alcohol about him when he took the defendant into custody.

Ordinarily if the state shows a Miranda warning was given, it meets its burden of proving a custodial statement was voluntarily given. *State v. Linder*, 268 N.W.2d 734, 735 (Minn.1978). The state need only prove a voluntary waiver by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986). Where the evidence suggests a custodial statement may not have been voluntarily waived, the trial court should make specific factual findings at the omnibus hearing.

---

**2.** At this point, where the harm to defendant is determined to be slight, it is reasonable to conclude that the constitutional challenge to the rule of evidence is obviated. This is so because harmless error analysis would seem to dictate that no reversal can be had where the harm to defendant's case is only slight.

*Linder,* 268 N.W.2d at 735. This court will not reverse specific factual findings unless they are clearly erroneous. *Id.* The court will, however, make its own independent evaluation of whether the waiver was knowing, intelligent and voluntary, based on the facts as found. *Id.*

The trial court in this case made no specific findings as to the admissibility of the videotape. The defendant did not request specific findings at either the Rasmussen hearing or at trial and has not challenged the absence of such findings in his appeal. This court, therefore, assumes the trial court would have made such finding if requested, and views the evidence in a light favorable to upholding the trial courts' admission of the videotape statement. *See State v. Morgan,* 296 N.W.2d 397, 401 (Minn.1980) (absent specific findings, this court assumed trial court believed testimony of police officers, supporting admission).

The trial court had two chances to view the videotape—at the Rasmussen hearing and at trial. The trial court certainly would have been able to notice any gross defects in the defendant's verbal or cognitive abilities. Apparently, the trial court found no such defects. The defendant himself states at the end of the videotape that he is, at the time, feeling fine. A review of the videotape does not indicate the trial court's finding was clearly erroneous.

Even if the interview was erroneously admitted, it only constitutes reversible error if it is not found harmless beyond a reasonable doubt. *State v. Forcier,* 420 N.W.2d 884, 886–87 (Minn.1988). Unless admission of defendant's statement in the video interview, that he was not drunk at the time of the shooting, constitutes reversible error, the rest of the interview is merely duplicative and cumulative, and could not reasonably have affected the jury decision. While defendant's intoxication was an important issue at trial, and the video statement is perhaps the state's strongest evidence on that issue, the defendant still was not free to testify to his great intoxication. If the video were inadmissible initially, it would have been admissible to

impeach. *Id.* at n. 6 (citing *Harris v. New York,* 401 U.S. 222, 224–26, 91 S.Ct. 643, 645–46, 28 L.Ed.2d 1 (1971)); Minn.R.Evid. 609.

The importance of the videotape statement, if erroneously admitted, must be weighed in view of the defendant's burden to prove incapacity due to intoxication as a defense at trial. Given defendant's selective memory and purposeful acts, and his inability to state at trial that he was drunk, we find the admission of this videotape if erroneous would not have affected the jury's implicit finding that the defendant did not meet his burden of proving incapacity. Thus, the error, if any, was harmless.

## V.

Defendant advances 19 reasons why the performance of his public defender at trial was so deficient as to deny him a fair trial as guaranteed under the due process clause.

The sixth amendment right to counsel is a right to " 'a reasonably competent attorney,' whose advice is 'within the range of competence demanded of attorneys in criminal cases.' " *U.S. v. Cronic,* 466 U.S. 648, 655, 104 S.Ct. 2039, 2044, 80 L.Ed.2d 657 (1984) (citation omitted). It is "the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing." *Id.* at 656, 104 S.Ct. at 2045. A lawyer is presumed to be competent. *Id.* at 658, 104 S.Ct. at 2046. The burden rests on the defendant to demonstrate that counsel's conduct was so deficient as to affect the reliability of the trial process. *Id.* In addition to showing deficient performance, the defendant must also show the counsel's performance was so deficient that it prejudiced the defendant. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984):

The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a proba-

bility sufficient to undermine confidence in the outcome.

*Id.* at 694, 104 S.Ct. at 2068.

This court has indicated it is inappropriate to first raise issues of ineffective assistance of counsel on appeal without having sought a post-conviction hearing. *State v. Cermak,* 350 N.W.2d 328, 332, n. 5 (Minn. 1984). Thus, where defendant's claims lack the necessary factual support, the presumption of defense counsel's competence compels the court to find against the defendant.

 Defendant, who is black, alleges that blacks were unconstitutionally excluded from the jury panel. It is fundamental constitutional law that the defendant has a right to have a jury selected from a venire from which members of his race have not been purposefully excluded. *Strauder v. West Virginia,* 100 U.S. 303, 305–06, 25 L.Ed. 664 (1880). Recently, the U.S. Supreme Court has applied the logic of *Strauder* to the prosecutor's use of peremptory challenges in selecting the petit jury. *Batson v. Kentucky,* 476 U.S. 79, 89, 106 S.Ct. 1712, 1719, 90 L.Ed.2d 69 (1986). A prosecutor may not challenge potential jurors solely on account of their race. *Id.*

Importantly, the Supreme Court in *Batson* rejected the previous burden of proof placed on a defendant to show purposeful discrimination in jury selection. *Id.* at 92–93, 106 S.Ct. at 1720–21; *cf. Amos,* 347 N.W.2d at 503 (relying on old standard of proof). *Batson* held a defendant may make a prima facie showing of purposeful discrimination by showing that (1) members of his racial group have not been summoned for jury service over a period of time, or (2) the prosecutor has exercised peremptory challenges to remove potential jurors of the defendant's recognizable racial group. *Batson,* 476 U.S. at 94–95, 106 S.Ct. at 1721–22. If defendant makes out a prima facie case, the burden shifts to the state to show the decisions were made on nonracial grounds. *Id.* at 94, 106 S.Ct. at 1721.

In this matter, defendant made none of the requisite showings. Therefore, his claim of ineffective assistance of counsel, based on failure to object to the jury composition, cannot be assessed.

We find defendant's remaining alleged errors are essentially complaints with the public defender's choice of trial tactics, which are usually not a basis for finding ineffective assistance of counsel. *Strickland,* 466 U.S. at 689–90, 104 S.Ct. at 2065–66. After careful examination of all defendant's claims of ineffective assistance of counsel, we find them meritless.

AFFIRMED.