**STATE of Minnesota, Respondent,**

v.

**Zachary NMN PERSITZ, Appellant.**

**No. C3–93–1840.**

Supreme Court of Minnesota.

June 30, 1994.

---

John M. Stuart, State Public Defender, Susan K. Maki, Asst. State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, and Michael O. Freeman, Hennepin County Atty., J. Michael Richardson, Asst. County Atty., Minneapolis, for respondent.

## OPINION

GARDEBRING, Justice.

Following a jury trial, appellant Zachary Persitz was convicted of one count of first degree premeditated murder in violation of Minn.Stat. § 609.185(1) in connection with death of Michael Prozumenshikov on January 28, 1991. Appellant asserted a defense of "not guilty by reason of mental illness," and his trial was bifurcated pursuant to Minn. R.Crim.P. 20.02, subd. 6(2). After the second phase of the bifurcated trial, the jury rejected his defense of not guilty by reason of mental illness. Appellant was sentenced to life in prison and now appeals from the judgment of conviction.

The murder in this case arises from a breakdown in the financial relationship between the defendant and his victim. Both were Russian immigrants to the United States and were family friends. Persitz admitted to killing Prozumenshikov, but asserted that he did so in the heat of passion because the victim had for years mismanaged money appellant invested with Prozumenshikov and also because of a provocative statement Prozumenshikov made in the midst of a confrontation over the investments. The state's theory was that Persitz intended to obtain a signed agreement from Prozumenshikov as to the loss of the money and then to murder him, so that Persitz could use the coerced agreement to recover his lost investment from Prozumenshikov's employer.

Appellant testified in his own behalf. He said that he emigrated to the United States in 1977 and was hired three months later by the Minnesota Department of Natural Resources ("DNR") to work as a dam inspector. Prozumenshikov was a dentist, but was unable to obtain a license to practice in the United States. He eventually became a stockbroker. Appellant testified that he met Prozumenshikov several years after he arrived in the United States.

In 1986, appellant's wife received a $100,000 settlement from an accident and appellant testified that, after a great deal of prompting by Prozumenshikov, he decided to invest the money through him. He testified that Prozumenshikov orally promised him that he would invest conservatively and that appellant would receive an 18% return on the investment. Appellant further testified that through mismanagement of the investment Prozumenshikov eventually caused appellant to lose more than $200,000, based on the expected 18% return on his investment. During this same time period, Prozumenshikov's income steadily increased, allowing him to buy a Mercedes and a gold Rolex watch.

Appellant testified that he repeatedly tried to get Prozumenshikov to sign an agreement documenting his promise of an 18% return on appellant's investment beginning in 1988, after he read that other Russian clients of Prozumenshikov were suing him. Prozumenshikov either refused to sign the agreement or promised to mail it and never did.

The ongoing disagreement culminated on the night of the shooting. Appellant testified that he went to Prozumenshikov's workplace at 6:30 p.m. and waved him over as he exited the parking garage. For several hours appellant tried to get Prozumenshikov to sign the agreement, but he refused. He did, however, try to obtain the $200,000 for appellant by calling several friends.

At one point in the evening, appellant forced Prozumenshikov to put on a set of handcuffs, which he had in the trunk of his car, and then loaded a gun which he also had with him. After appellant loaded the gun,

they began to argue and exchange insults. Prozumenshikov shouted a phrase in Russian that appellant translated as cursing appellant and his family, and appellant testified that he "saw his lips moving and he was close but I couldn't hear what he was saying. * * * I looked around me and I didn't see Michael. I looked down and he was laying on the snow, and I had gun in my right hand, so I couldn't believe it. * * * I was in such a rage for what he made me do, so I pulled him into the car onto the driver's seat, * * * and I shot him a second time."

Appellant testified that he then went to his home and later in the evening moved the body to a park. In the morning he went to the park, put the body in the trunk of his car, and headed east on I–94, eventually turning into a compost site off of Highway 95. He testified he had never been to the site before, and that he didn't see the gate across the entrance and crashed through it. He tried digging a hole, but the ground was frozen. He then decided to separate parts of the body so that Prozumenshikov wouldn't be able to haunt him. He removed the head and hands with a hatchet because he didn't want the body to be identified. He covered himself with a protective coverall suit that he testified he got from his garage that night. When he left the compost site, he drove toward Taylor's Falls and, while driving over a bridge there, threw Prozumenshikov's watch toward the river, and threw the bag with his head and hands into the river. He also threw the hatchet and the plastic bags out of the car on the way back to St. Paul. The bloody hatchet was later found by the roadside.

After arriving back in St. Paul, appellant went to work and then to a car wash close to his workplace. He threw the plastic bags from the trunk and the protective suit into the garbage there. He insisted that the car wash employees clean the blood out of his

trunk, telling them that it came from a deer. He then went to work and called his wife, inviting her to have lunch and asking her to bring his gym bag with her. He met her at the YMCA and changed clothes. The next day he returned the borrowed gun to his friend.

The state introduced physical evidence that contradicted appellant's description of how the killing occurred and circumstantial evidence supporting its theory of the case, that appellant had intentionally killed Prozumenshikov as part of a scheme to recover the value of his lost investments. In particular, the state theorized that the victim had been shot while he sat in appellant's car. First, the state introduced extensive testimony regarding the equipment used to commit the murder and dispose of the body. Testimony was introduced showing that appellant purchased a pair of handcuffs in December of 1990, that he went to a shooting range at the beginning of January of 1991, and that he borrowed a gun from a friend the day before the killing. He testified that his intent was to use the handcuffs and gun to scare Prozumenshikov into signing the agreement.

There was also testimony with regard to the protective suit worn by appellant after the murder. The state attempted to show that appellant had acquired a protective suit in advance of the confrontation as part of his planning to kill and dismember Prozumenshikov. Appellant's co-workers at the DNR testified that protective suits are only used by employees trained to work at contamination sites and would not ordinarily be needed by a dam inspector, and further that appellant had sought a protective suit on the day of the murder. A detective also testified to having used appellant's keys to gain access to the storeroom at the DNR where such protective suits were kept and having found an open box of three suits with one missing.[1]

1. Appellant denied that he obtained a new protective suit from the storage room at work prior to the murder. He admitted that he was trying to locate a new protective suit about a week before the killing. He testified that his old one was torn, so he looked for a replacement because he used the suit at work as rain gear and for walking through brush when visiting dams. He testified that he went to Sears and then bought a coverall suit at Sherwin Williams paint store, but that suit turned out to be made of a paper-type material. He testified that after he saw it, he spoke to a co-worker at work to see if there were any extra protective suits and she said none were available. Therefore, appellant testified that he used an old protective suit that he had in his garage on the night of the killing.

He also found a sheath to a hatchet in appellant's storage locker.

In addition, the state introduced evidence with regard to the state of appellant's car, and the state of the victim's body, to support its theory of premeditation. A forensic serologist testified that samples from the passenger-side carpet of appellant's car, the driver's seat lower back and the carpet of the trunk were consistent with the victim's blood, as was blood on the hatchet found along the roadside of Highway 95. Further, car wash employees testified that the driver's seat of appellant's car smelled of urine, and when state investigators recovered the car, appellant had cut out the seat cushions on the driver's side. The state argued that this evidence supported their theory that the victim was shot in the car and his bladder voided at death. Appellant stated that this happened when he shot Prozumenshikov for the second time. The state also presented a gun spatter expert who testified that the blood patterns on the sunvisor and headliner of the car were consistent with someone being shot in the head in the front seat. The county medical examiner testified that the evidence of lividity was consistent with the body having remained on its side in the same position for eight to twelve hours after death. The state argued that this evidence contradicted appellant's testimony that he moved the body from his trunk to a parking lot in a park. The medical examiner also concluded that some of the marks left by the dismemberment were probably made by a saw. The state argued that this showed planning, and that appellant lied when he testified that he used only a hatchet that he kept in his car to dismember the body.

Further, in addition to the physical evidence, the state presented various witnesses to support the theory that appellant planned the killing in advance. Appellant admitted on cross-examination that he had "hated" Prozumenshikov since 1987. The state submitted evidence that the $100,000 appellant invested had decreased to $28,000 by 1989 and to $8,000 approximately four weeks before the killing. The state also introduced evidence that six months before the killing, appellant visited the compost site where he disposed of the body, contradicting appellant's testimony that he had never been to the site before the night he killed Prozumenshikov. An employee at the compost site testified that she remembered and recorded talking to a man in a Minnesota DNR auto on July 25, 1990, and her supervisor corroborated her testimony. She identified appellant in the courtroom as the man with whom she spoke. The state also offered testimony from a passer-by who noticed a car parked outside the compost site gate at 7:00 a.m. on January 29, 1991, to contradict appellant's assertion that he had accidentally crashed into the gate while travelling at 30 miles per hour.

■■■ Appellant asserts that several errors were made during his trial. We first consider his claim that the trial court denied him his constitutional right to present a defense when it ruled that he could not present expert psychiatric testimony regarding his state of mind during the guilt phase of his bifurcated trial. We very recently reaffirmed our rule that expert psychiatric opinion testimony is generally not admissible during the guilt phase of a bifurcated trial. *State v. Provost*, 490 N.W.2d 93, 103 (Minn.1992). We noted several exceptions, one of which was

> where the defendant has a past history of mental illness. If the past history includes a clinical record wherein psychiatric opinions appear (such as a diagnosis), it may be that such evidence would be admissible. * * * This evidence is in the nature of factual background to explain 'the whole man' as he was before the events of the crime and before the miasma of after-the-crime rationalizations.

*Id.* at 103–04. Appellant asserted in a pretrial motion that the psychiatric and psychological evidence in his case fit this exception and should have been admitted. He argued that he and his family had a history of mental illness and that the jury should hear about his longstanding, inherited mental illness in the first phase of the trial, in order to understand his thought process vis-a-vis the deceased. Appellant argues that the trial court erred in denying his motion.

Appellant has not, however, created a factual record upon which the trial court could have based a conclusion that this case fit the exception noted in *Provost*. There was no offer of proof as to "clinical record[s] wherein psychiatric opinions appear" which he sought to admit. *See Provost*, 490 N.W.2d at 104. Appellant states in his pro se reply brief that his medical records from Russia were given to the doctors that treated him, citing generally to the psychiatric opinion testimony admitted during the second phase of the trial. One of the psychiatric experts stated that he used "records" of appellant's mother and brother translated from Russian, and also referred to reports that he had which were given to him from "other sources." The other expert states that he relied on post-indictment reports only. Neither expert specifically noted using any prior clinical records of appellant, nor did either expert state whether any records on which he relied contained diagnoses of appellant's mental illness. There is nothing in the record which directly supports appellant's contention. Given that appellant has not shown that he clearly fits within an exception to the *Provost* rule that psychiatric opinion testimony is generally excluded from the guilt phase of the trial, the trial court's ruling was not erroneous.

We next consider appellant's claim that the trial court erred by refusing to adopt appellant's requested jury instruction presenting his "theory of the case" at the close of the first phase of his bifurcated trial. A party is entitled to an instruction on his theory of the case if there is evidence to support it, but the court need not give the requested instruction if it determines that the substance of the request is contained in the court's charge. *State v. Blasus*, 445 N.W.2d 535, 542 (Minn.1989); *State v. Ruud*, 259 N.W.2d 567, 578 (Minn.1977), *cert. denied*, 435 U.S. 996, 98 S.Ct. 1648, 56 L.Ed.2d 85 (1978). The refusal to give a requested jury instruction is within the discretion of the trial court and no error results unless an abuse of discretion is shown. *Blasus*, 445 N.W.2d at 542.

Appellant's theory of the case was that he killed the victim, but that he was guilty only of first degree manslaughter, not first degree murder. The trial judge took pains to instruct the jury on the elements of first degree manslaughter. He also included as one of the elements of his instruction on first degree murder "that defendant did not act in the heat of passion provoked by such words or acts as would provoke a person of ordinary self control in like circumstances." The trial court defined each of the three possible guilty verdicts, first or second degree murder and first degree manslaughter, and elaborated on the elements of each. The court went on to state:

> Even if defendant acted with premeditation and with intent to kill Michael Prozumenshikov, if defendant acted in the heat of passion defendant is not guilty of murder in the first degree. However, such heat of passion is not a complete excuse for the killing of another person. The heat of passion may cloud defendant's reason and weaken willpower, and this is a circumstance which the law considers in fixing the degree of guilt.
>
> If the heat of passion is provoked by words or acts which would provoke a person of ordinary self control in the same circumstances, an intentional killing is reduced to manslaughter in the first degree.

The court also explained that the state has the burden of showing that the defendant did not act in the heat of passion:

> Whether you find premeditation or not, if you find that each of the other elements has been proved beyond a reasonable doubt, except that you find it has not been proved that defendant did not act in the heat of passion, defendant is guilty of manslaughter in the first degree.

The court also generally instructed the jury regarding the lesser included offenses, stating:

> The law provides that upon the prosecution of a person for a crime if the person is not guilty of that crime the person may be guilty of a lesser crime. The lesser crimes in this case are murder in the second degree and manslaughter in the first degree. * * * If you find beyond a reasonable doubt that defendant has committed a crime but you have a reasonable doubt

which crime has been committed, the defendant is guilty of the lesser crime only.

Furthermore, defense counsel argued the defendant's theory of the case in his closing argument. At the outset he stated:

> The fact of the matter is that we said in the beginning that this is a manslaughter case * * * as opposed to murder. It always was a manslaughter case. If everything the prosecutor said is gospel truth * * * it's still a manslaughter case. I'll explain to you why * * *.

The remainder of the closing argument is devoted to educating the jury about the legal distinction between murder and manslaughter, and arguing that the facts supported only a verdict of manslaughter, ending with the request that the jury convict Persitz of manslaughter in the first degree.

The court refused to give appellant's requested instruction. The lengthy instruction proposed by appellant contained a blend of facts and law that would have, if given, amounted to a court-sponsored closing argument.[2] This language would surely have the consequence we feared in *State v. Olson*, when we said that such an instruction would "tend to inject argument into the judge's charge and lengthen it unnecessarily." *State v. Olson*, 482 N.W.2d 212, 215 (Minn.1992) (citing *Manual of Model Criminal Jury Instructions for the Ninth Circuit* (1989 ed.)). In addition, the trial court did carefully instruct the jury on the elements of first degree manslaughter, defense counsel argued for a verdict of first degree manslaughter in his closing argument, and the prosecutor argued to the contrary in his closing argument. *See State v. Daniels*, 361 N.W.2d 819, 832 (Minn.1985) (refusal to give instruction not error and not prejudicial where both counsel argued the issue in closing argument). The trial court did not abuse its discretion in refusing to give the requested instruction.

■ Appellant also contends that the trial court erred during the second phase of his bifurcated trial. Appellant asserts that as part of instructing the jury as to the elements of the defense of mental illness, the trial judge should have included an instruction stating that the jury should consider appellant's cognition, volition and capacity to control his behavior to determine whether he proved by a preponderance of the evidence that he was mentally ill at that time. We recently decided the precise issue raised in this appeal in *State v. Jolley*, 508 N.W.2d 770 (Minn.1993). In this case, as in *Jolley*, the trial court gave the standard CRIMJIG 6.02 instruction. The court stated:

> Under the statutes of Minnesota, a person is not criminally liable for an act when, at the time of committing the act, the person did not know the nature of the act, or did not know that it was wrong because of a defect of reason caused by mental illness. The defense of mental illness is as follows: First, the defendant did not know the nature of the act. This means defendant did not understand what the defendant was doing. If because of a defect of reason defendant did not know what action the defendant was taking or what the consequences of the defendant's actions would be, then defendant did not know the nature of the act.
>
> Second, even if defendant knew the nature of the act, the defendant did not understand that the act was wrong. The word "wrong" is used in the moral sense and does not simply refer to violation of a statute. Stated another way, even if de-

2. Appellant requested the following jury instruction:

> It is Mr. Persitz' theory of defense that he had no intent to kill Michael Prozumenshikov. Mr. Persitz alleges that what he planned to do was extract from Mr. Prozumenshikov a signed acknowledgement of debt, nothing more, nothing less. Mr. Persitz alleges that he fired the fatal shot only after, and as a result of, a heated exchange between himself and Mr. Prozumenshikov where Mr. Prozumenshikov insulted not only Mr. Persitz but, far more importantly, Mr. Persitz' family. Mr. Persitz alleges that the words Mr. Prozumenshikov used to describe his family, in combination with years of frustration in dealing with Mr. Prozumenshikov, and with knowledge of Mr. Prozumenshikov's belittling attitude toward the Russian community has [sic] a whole, provoked Mr. Persitz. In the heat of passion, he pulled the trigger. Mr. Persitz acknowledges that he is guilty of manslaughter in the first degree, and he asks the jury to convict on that offense. Mr. Persitz alleges, though, that he is not guilty of murder in the first or second degree.

fendant realized that the act violated the law, defendant is not criminally liable if, because of a defect of reason, defendant did not understand that the act was morally wrong.

Third, failure of the defendant to know the nature of the act or that it was wrong must have been the result of a defect of reason caused by mental illness.

See *Jolley,* 508 N.W.2d at 771–72. This instruction is a form of the pattern instruction in 10 Minn. Dist. Judges Ass'n, *Minn. Practice,* CRIMJIG 6.02 (3d ed. 1990).

In *Jolley,* as in this case, the crux of appellant's case was that he did not have the capacity to control his behavior. *See Jolley,* 508 N.W.2d at 773 (Wahl, J. dissenting). As in *Jolley,* the trial court rejected the appellant's request that he instruct the members of the jury that they may consider such evidence. Nothing about this case legally distinguishes it from *Jolley;* the trial court's refusal to instruct the jury that it could consider evidence of appellant's cognition, volition and capacity to control his behavior was not error.

■ Finally, appellant argues that the evidence was insufficient to support the jury's verdict finding him guilty of first degree premeditated murder. Defendant admitted that he was guilty of first degree manslaughter, "intentionally caus[ing] the death of another person in the heat of passion provoked by such words or acts of another as would provoke a person of ordinary self-control under like circumstances * * *." *See* Minn. Stat. § 609.20(1) (1992). The jury returned a verdict of guilty of first degree murder, "caus[ing] the death of a human being with premeditation and with intent to effect the death of the person or of another." *See* Minn.Stat. § 609.185(1) (1992).

The state submitted evidence upon which the jury could have based its conclusion that appellant premeditated killing Prozumenshikov. Appellant testified that he was very angry with the victim and that he had hated him since 1987. Evidence was admitted showing that appellant bought handcuffs, obtained the gun he used to kill Prozumenshikov, and went target shooting at silhouettes in advance of the killing. A co-worker testi-

fied that appellant stated that he needed a protective suit for work the day before the killing, although workers in his position did not typically need such suits. The monitor of the compost site where appellant disposed of the body testified that appellant visited the site six months before the killing.

Furthermore, the state submitted expert testimony that the physical evidence contradicted appellant's claim that he shot Prozumenshikov in a rage. No blood was found at the lakeside where appellant said the incident occurred. No one nearby heard the shot. The driver's side seat cushion contained urine which supported the inference that appellant shot the victim while he was sitting in the car. The blood spatter pattern within the car was consistent with the victim having been shot while sitting in the driver's seat of the car. The jury was free to evaluate appellant's testimony and find it incredible. *See State v. Berry,* 309 N.W.2d 777, 784 (Minn.1981). We find that the evidence was sufficient to support the jury's verdict.

Affirmed.