**STATE of Minnesota, Respondent,**

v.

**William James AUCHAMPACH, Jr., Appellant.**

No. C2–94–950.

Supreme Court of Minnesota.

Dec. 1, 1995.

810

John M. Stuart, Minnesota State Public Defender and Scott B. Swanson, Assistant State Public Defender, for appellant.

Hubert H. Humphrey III, State Attorney General, Mary J. Theisen, Assistant Attorney General, St. Paul; and Gary Fridell, Goodhue County Attorney, Red Wing, for respondent.

OPINION

ANDERSON, Justice.

A Goodhue County Grand Jury indicted William J. Auchampach, Jr. on ten counts, including three counts of first-degree mur-

der, for the stabbing death of his former girlfriend, Daillene Counts. A jury convicted Auchampach on all counts except for first-degree murder while committing criminal sexual conduct. The jury did not convict Auchampach of the lesser-included offense of first-degree manslaughter. The trial court sentenced Auchampach to life imprisonment for first-degree murder and to three lesser terms on other counts. Auchampach appeals from his conviction on the two counts of first-degree murder. He argues that the trial court committed reversible error by refusing to give an instruction to the jury pursuant to CRIMJIG 11.05, which enumerates the absence of heat of passion as an element of premeditated first-degree murder. Auchampach also argues that Minnesota's domestic abuse homicide statute is unconstitutionally vague because it does not define the term "pattern" in the phrase "past pattern of domestic abuse." We affirm.

Auchampach and Counts met in April 1991, and began a romantic relationship. They periodically lived together and had one child, a daughter, who was born April 11, 1992. By March 1993, their relationship had deteriorated, and the two of them lived apart. At that time, Auchampach had custody of their daughter, and most of the contact between Auchampach and Counts occurred during Counts' visitations with their daughter.

On Friday, March 19, 1993, Auchampach left his parents' home in Red Wing, Minnesota, where he and his daughter were then living, to go out for dinner. He was accompanied by his daughter, his parents, and a friend, Jay Lampman. On their way to dinner, the group drove to Counts' apartment to leave the daughter with her mother for a weekend visit. Both Auchampach and his daughter went into the apartment. Counts was present, as was her friend Kathryn Wedell and Counts' two children from her previous marriage. Counts' other two children were ages five and three. Counts asked Auchampach to step into a bedroom where they talked for fifteen to twenty minutes. During the conversation, Counts apparently told Auchampach that she had contracted

chlamydia, a sexually transmitted disease, and suggested that he get himself tested for the disease. According to Auchampach, Counts then said, "Good luck finding a girlfriend now." Auchampach became angry with Counts and stormed out of the house. He returned a moment later, "screaming" at Counts and asking her for a small amount of money that she owed him. Counts refused to pay. Auchampach then yelled, "I'm surprised you didn't give me AIDS," and left in anger, leaving their daughter with Counts.

Auchampach decided not to go out for dinner and asked his parents to take him to a liquor store to buy beer. After stopping at the liquor store, Auchampach's parents left Auchampach and Lampman at Lampman's house, where the two drank beer and played cards. While at Lampman's house, Auchampach told Lampman that he was going to kill Counts; that he was going to "fuck her up" and "finish" her. Eventually, Lampman and Auchampach decided to leave Lampman's house to go to a party at the apartment of Jerry Lewis, who lived at a local Red Wing motel. Before leaving, Auchampach asked Lampman for a knife. Lampman told Auchampach he did not know whether there were any knives in the house. Auchampach went into the kitchen and Lampman heard a drawer open, but he never saw Auchampach with a knife.[1]

Auchampach and Lampman then left Lampman's house and walked to the party, staying only fifteen or twenty minutes. A juvenile female who was at the party heard Auchampach say, "I'm going to kill her. I'm going to fucking kill her." Auchampach, Lampman, and Lewis left the party and walked toward Lampman's house. Somewhere along the way, Auchampach left the other two and went off on his own. Lampman and Lewis returned to Lampman's house and watched the movie "Goodfellas." While watching the movie, Lampman told Lewis that Auchampach had told him that he was going to kill Counts.

Several hours later, Auchampach returned to Lampman's house. Lewis left shortly after Auchampach's return. Auchampach then

---

1. At trial, Auchampach admitted that he took a knife from Lampman's kitchen, although Auchampach claimed that Lampman gave him the knife.

told Lampman that he had killed Counts. Auchampach said, "I fucked the bitch up." Auchampach told Lampman that he stabbed Counts in the heart, but Lampman later indicated that he did not believe Auchampach. Auchampach spent the night at Lampman's house.

The following morning, March 20, Auchampach went to the hospital to be tested for chlamydia. Later that morning, Auchampach returned to his parents' home and Lampman arrived a short time later. At approximately 2:30 p.m., Auchampach's brother called from the Minnesota Correctional Facility at Saint Cloud. Lampman answered the phone and told the brother that he should speak to Auchampach. Auchampach then spoke to his brother and told him he had killed Counts and had left the three children with her body.

Later that evening, between 5:30 and 6:00 p.m., Kathryn Wedell went to Counts' apartment and found Counts stabbed to death. The three children were present and were screaming and crying. Counts' daughter from her previous marriage told Wedell that "Bill" killed her mother. Wedell ran to a neighbor's home and the neighbor called 911.

The police arrived a short time later. After determining that Auchampach was a suspect, the officers went to the home of Auchampach's parents, where they found and arrested him. In the basement of Auchampach's parents' home, police found a hand-drawn picture of a bleeding heart with a knife sticking out of it and with the words "help me" written underneath it. Auchampach was taken to the Red Wing police station. Later that evening, during an audiotaped interview with police officers, Auchampach denied killing Counts.

On April 19, 1993, the Goodhue County Grand Jury indicted Auchampach on ten counts, including three counts of first-degree murder: with premeditation; while committing criminal sexual conduct with force or violence; and while committing domestic abuse.[2]

Prior to trial, Auchampach moved to dismiss the indictment or, in the alternative, to dismiss two of the counts contained in the indictment. Auchampach argued that Minn. Stat. § 609.185(6), the domestic abuse homicide statute, is unconstitutionally vague because it does not define the term "pattern" in the phrase "past pattern of domestic abuse." In its omnibus order, the trial court did not address whether the statute was unconstitutionally vague because the precise facts that the state intended to present at trial were unknown and because Auchampach had not presented or conceded any facts necessary for determining whether a pattern existed.

A trial was held from November 8 through December 1, 1993. At his trial, Auchampach admitted killing Counts, but denied that he premeditated the murder. He claimed that the killing occurred in the heat of passion. Auchampach testified that the following events transpired after he left Lampman and Lewis. He went to Counts' apartment intending only to vandalize either Kathryn Wedell's car or the car of the man whom he suspected that Counts was seeing. But, when he arrived at Counts' apartment at about 10:00 p.m., no cars were present. So instead, Auchampach decided to break the front door window. He banged on the window in the door with the butt of the knife he took from Lampman's house, but the window did not break. A light came on in Counts' apartment and she came to the door.

---

**2.** The ten counts were as follows: count I, murder in the first degree, with premeditation, Minn. Stat. § 609.185(1) (1992); count II, murder in the first degree, while committing criminal sexual conduct with force or violence, Minn.Stat. § 609.185(2) (1992); count III, murder in the first degree, while committing domestic abuse, when the perpetrator has engaged in a past pattern of domestic abuse upon the victim, Minn. Stat. § 609.185(6) (1992); count IV, murder in the second degree, with intent but without premeditation, Minn.Stat. § 609.19(1) (1992); count V, murder in the second degree, without intent while an order for protection is in effect, Minn. Stat. § 609.19(3) (1992); count VI, murder in the third degree, without intent but evincing a depraved mind, Minn.Stat. § 609.195(a) (1992); count VII, criminal sexual conduct in the second degree, sexual contact, causing personal injury by force or coercion, Minn.Stat. § 609.343, subd. 1(e)(i) (1992); count VIII, assault in the second degree, with a dangerous weapon, Minn.Stat. § 609.222, subd. 1 (1992); count IX, endangerment of a child, Minn.Stat. § 609.378, subd. 1 (1992); and count X, neglect of a child, Minn. Stat. § 609.378, subd. 1(a)(1).

Counts let Auchampach into the apartment. When he entered the apartment, Auchampach concealed the knife under his jacket.

Auchampach testified that once Counts let him into her apartment, they sat and talked. He testified that his daughter and Counts' young son were both awake, that he rocked his daughter to sleep, and that he then put his daughter and Counts' son to bed. He stated that even though he was "drunk" at the time, he was feeling "comfortable" and "at home again" sitting in his chair in the usual spot with the children present. He testified that during this time, he had taken off his jacket and placed it and the knife under his chair.

After the children were put to bed, which occurred within 10 to 15 minutes after Auchampach entered the apartment, Counts told Auchampach that she did not want to spend Easter, which was also their daughter's birthday, with him, but instead wanted to spend it with another man and that she wanted their daughter to be with her and the other man. Auchampach testified that when Counts' plans for Easter were discussed, the mood shifted and that he felt shocked and hurt and that he was crying. Counts proceeded to tell Auchampach that she had been seeing another man during a period when Auchampach and Counts were still romantically involved and when Auchampach was serving 80 days in jail for assaulting a police officer. Auchampach asked Counts whether she had contracted chlamydia from the man whom she was seeing while Auchampach was in jail. Counts responded that she had not and told Auchampach that she had contracted chlamydia from a different man. Auchampach testified that he was hurt and angry because Counts had been lying to him and that he responded by grabbing the knife, stabbing Counts in the heart, throwing her on the floor and slashing her.[3] Auchampach testified that he watched Counts die, sought no medical help, left the apartment, locked

the door, threw the knife in a gutter, and made his way back to Lampman's house. Auchampach admitted to leaving the children in the apartment with Counts' body. He stated that the total time he was at Counts' apartment was between 30 to 45 minutes.

Because Auchampach was indicted for domestic abuse homicide, the state presented evidence of domestic abuse. Two individuals testified about acts of domestic abuse that they had either heard or observed Auchampach commit against Counts. First, a neighbor of Counts testified that on January 7, 1993, she made a complaint to the Red Wing Police Department because she could hear Auchampach and Counts arguing all day. The neighbor testified that she heard something being smashed against the wall that separated her apartment from Counts' apartment. During the argument, the neighbor heard Auchampach make many abusive comments to Counts, including: "I'm going to get you bitch," and "I'm going to smash you." She also heard Auchampach say that he was going to "beat the shit out of her." Second, a friend of Counts testified that she saw Auchampach drag Counts by the hair and be verbally abusive toward her while Auchampach was arguing with Counts in a bar.

Two individuals testified about acts of domestic abuse by Auchampach that they had not personally witnessed, but which Counts had related to them. First, a woman with whom Counts had stayed two or three years prior to trial testified that she had seen a slap mark on Counts' face during the time Counts was dating Auchampach. The woman testified that Counts told her that Auchampach had slapped her face, causing the mark. Second, a court-appointed custody evaluator testified that during a January 4, 1992 interview regarding the custody of their daughter, Counts told the evaluator that Auchampach often slapped her and her children, hit her when she was pregnant, and frequently ripped items off the wall. Counts

---

**3.** At trial, the coroner testified that Counts had a deep stab wound, inflicted through her clothing, which reached her heart and caused her death. Much of Counts' clothing had been cut, and her abdomen, both arms, thighs, and buttocks were slashed. She also had a deep stab wound in her buttocks, a stab wound below her left breast, and

a "T" carved into her stomach. Finally, her left eye was bruised. The medical examiner opined that although the injury to her eye was inflicted before Counts died, perhaps as much as a day before, the other injuries, aside from the single fatal stab wound to the heart, were probably post-mortem.

also told the evaluator that Auchampach became more abusive with her once she became pregnant with their daughter. Finally, Counts related to the evaluator an incident that occurred on December 21, 1992, in which Auchampach hit her in the back, threw a can at her, and put her in a choke hold after she refused to have sex with him.

The state also presented two orders for protection that Counts had sought during her relationship with Auchampach. On September 21, 1992, Counts filed an affidavit and petition in support of an order for protection, asserting that Auchampach was physically and emotionally abusive toward her. At Counts' request, an order dismissing the petition was filed September 29, 1992. On December 28, 1992, after the December 21, 1992 incident referred to above, Counts obtained a restraining order against Auchampach. Auchampach also sought and obtained a restraining order against Counts on the same day. As a result, an order was issued pursuant to a hearing attended by both Auchampach and Counts, which order restrained each of them from committing acts of domestic abuse against the other.

Finally, one individual testified about another occasion in which Auchampach allegedly threatened Counts. In January 1993, Auchampach was jailed in the Goodhue County jail for violating the December 28, 1992 restraining order. A fellow inmate testified that, while in jail, Auchampach told the inmate, who had also been jailed for violating a restraining order, that Auchampach knew that Counts had not called the police in regard to the violation because Auchampach had told Counts that he would "do her in" if she ever reported him. Within the context of the conversation, the inmate took "do her in" to mean to kill Counts.

At the close of trial, the trial court concluded that Auchampach had presented sufficient evidence to warrant an instruction to the jury on the lesser-included offense of first-degree manslaughter for intentionally causing Counts' death in the heat of passion. *See* Minn.Stat. § 609.20(1). The court, however, refused Auchampach's request to give an instruction to the jury pursuant to CRIMJIG 11.05, which enumerates the absence of heat of passion as an element of premeditated first-degree murder. On December 1, 1993, the jury convicted Auchampach on all counts except for count II, first-degree murder while committing criminal sexual conduct, and for the lesser-included offense of first-degree manslaughter. On February 7, 1994, Auchampach was sentenced to life imprisonment for first-degree murder; to 58 months to run concurrently for committing criminal sexual conduct in the second-degree; to one year for endangering a child; and to one year and one day for violating probation.[4]

I.

A person is guilty of manslaughter in the first degree when the person "intentionally causes the death of another person in the heat of passion provoked by such words or acts of another as would provoke a person of ordinary self-control under like circumstances * * *." Minn.Stat. § 690.20(1) (1992). Auchampach requested that the trial court give two jury instructions pursuant to Minnesota District Judges Association, Jury Instructions Guides, Criminal, 10 Minn. Dist. Judges Ass'n, *Minnesota Practice*, CRIMJIG 11.04 and 11.05 (3d ed. 1990). CRIMJIG 11.04 distinguishes between first-degree premeditated murder and first-degree manslaughter.[5] CRIMJIG 11.05 enumerates the absence of heat of passion as an element of

---

4. Auchampach was on probation for assaulting a peace officer at the time of the instant offenses.

5. CRIMJIG 11.04, entitled "Murder in the First Degree—Premeditation—Murder and Manslaughter Distinguished," provides:
    If a person intentionally kills another, the statutes of Minnesota provide that defendant is not guilty of murder if defendant acted in the heat

of passion provoked by such words or acts as would provoke a person of ordinary self-control in like circumstances. Such heat of passion, however, is not a complete excuse for the killing of another person. Whoever intentionally causes the death of another in such heat of passion is guilty of manslaughter in the first degree.

premeditated first-degree murder.[6] The state objected to instructing the jury pursuant to CRIMJIG 11.05, arguing that it was a "misstatement" of Minnesota law. The court gave an instruction pursuant to CRIMJIG 11.04, but refused to give an instruction pursuant to CRIMJIG 11.05.

■ It is preeminently the trial court's duty to exercise its discretion to determine what lesser degrees of homicide to submit to a jury, and neither the prosecution nor the defense can limit the submission of such lesser degrees as the court determines should be submitted. *State v. Leinweber,* 303 Minn. 414, 421, 228 N.W.2d 120, 125 (1975). If the evidence adduced at trial would permit a finding of guilty of a lesser offense, the defendant is entitled to appropriate instructions advising the jury of its power to return a verdict of guilty of the lesser offense. *State v. Jordan,* 272 Minn. 84, 86, 136 N.W.2d 601, 604 (1965). In determining what, if any, lesser degrees should be submitted, the test should be whether the evidence reasonably supports a conviction of the lesser degree and, at the same time, is such that a finding of not guilty of the greater offense would be justified. *Leinweber,* 303 Minn. at 422, 228 N.W.2d at 126. We have referred to this test as the "rational basis" test. *State v. Griffin,* 518 N.W.2d 1, 3 (Minn.1994).

■ In the context of a particular case, the defendant's testimony or statement may not be sufficient to satisfy the rational basis test established in *Leinweber,* if, when viewed in the context of all the evidence, it is so unworthy of belief that the jury could not rationally believe it. *Griffin,* 518 N.W.2d at 3 (holding defendant's testimony not so un-worthy of belief that no rational jury would be entitled to believe it); *State v. Richardson,* 332 N.W.2d 912, 913 (Minn.1983) (holding defendant's testimony, in the context of all the evidence against him, so unworthy of belief that jury could not rationally have believed it). Further, we have made it clear that a defendant's emotional state alone is not sufficient to mitigate murder to manslaughter; rather, the words and acts of a victim must have been enough to provoke a person of ordinary self-control. *State v. Cuypers,* 481 N.W.2d 553, 557 (Minn.1992) (citing *State v. Buchanan,* 431 N.W.2d 542, 549 (Minn.1988)).

In this case, Auchampach and Counts had had a romantic relationship, had lived together, and were the parents of a one-year-old daughter. Their relationship had deteriorated and they were living apart, but on the evening of the murder, their relationship was subjected to heightened emotional strain. Counts disclosed to Auchampach that she may have caused him to be infected with a sexually transmitted disease, that she had been seeing other men when she was romantically involved with Auchampach, and that she planned that she and their daughter would spend Easter, their daughter's first birthday, with another man. Auchampach testified that, in response to this information, he felt shock, hurt and anger. The trial court concluded that this testimony was not so unworthy of belief that no rational jury would be entitled to believe it, and that a jury might reasonably have inferred that Auchampach intentionally killed Counts in the heat of passion. Based upon this conclusion, the court did submit to the jury an instruc-

---

10 Minn. Dist. Judges Ass'n, *Minnesota Practice,* CRIMJIG 11.04 (3d ed. 1990).

6. CRIMJIG 11.05, entitled "Murder in the First Degree—Premeditation—Issue of Heat of Passion as Element," provides:
   The elements of murder in the first degree are:
   First, the death of ＿＿ must be proven.
   Second, defendant caused the death of ＿＿.
   Third, defendant acted with premeditation and with intent to kill＿＿ * * *.
   Fourth, defendant did not act in the heat of passion provoked by such words or acts as would provoke a person of ordinary self-control in like circumstances. Even if defendant acted with premeditation and with the intent to kill ＿＿, if defendant acted in the heat of passion defendant is not guilty of murder in the first degree. However, such heat of passion is not a complete excuse for the killing of another person. The heat of passion may cloud defendant's reason and weaken willpower, and this is a circumstance which the law considers in fixing the degree of guilt. If the heat of passion is provoked by words or acts which would provoke a person of ordinary self-control in the same circumstances, an intentional killing is reduced to manslaughter in the first degree.
   10 *id.* CRIMJIG 11.05.

tion on the lesser-included offense of first-degree manslaughter.

Auchampach argues, however, that the trial court abused its discretion when it specifically refused to instruct the jury pursuant to CRIMJIG 11.05. Auchampach asserts that the court's refusal entitles him to a new trial because the failure to instruct the jury pursuant to 11.05 effectively relieved the state of proving beyond a reasonable doubt an element of first-degree intentional murder—that Auchampach did not act in the heat of passion. Therefore, Auchampach claims that his due process rights were violated. We disagree. We conclude that the jury instructions given by the trial court, when viewed as a whole, adequately instructed the jury on the state's burden of proof.

A refusal to give a requested jury instruction in a criminal case lies within the broad discretion of the trial court. *State v. Daniels*, 361 N.W.2d 819, 831 (Minn.1985). The trial court is given "considerable latitude" in selecting the language for jury instructions. *Alholm v. Wilt*, 394 N.W.2d 488, 490 (Minn.1986). A trial court's refusal to give a particular jury instruction constitutes error only if the trial court abused its discretion. *State v. Persitz*, 518 N.W.2d 843, 848 (Minn.1994); *State v. Villalon*, 305 Minn. 547, 551, 234 N.W.2d 189, 192 (1975). A party is entitled to a particular jury instruction if evidence exists at trial to support the instruction. If, however, the substance of a particu-

lar instruction is already contained in the court's instructions to the jury, the court is not required to give the requested instruction. *State v. Ruud*, 259 N.W.2d 567, 578 (Minn.1977), *cert. denied*, 435 U.S. 996, 98 S.Ct. 1648, 56 L.Ed.2d 85 (1978). In reviewing the sufficiency of the trial court's jury instructions, the instructions must be viewed as a whole, in their entirety. *State v. Jones*, 347 N.W.2d 796, 801 (Minn.1984); *State v. Williams*, 324 N.W.2d 154, 159 (Minn.1982). Finally, the trial court's jury instructions must adequately instruct the jury on the state's burden to prove defendant's guilt beyond a reasonable doubt.

Due process requires that the state prove beyond a reasonable doubt the existence of every element of the crime charged. *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970); *State v. Clausen*, 493 N.W.2d 113, 116 (Minn. 1992). A defendant's due process rights are violated if the burden to disprove the existence of any element of the crime charged is impermissibly shifted to the defendant. *Mullaney v. Wilbur*, 421 U.S. 684, 701–04, 95 S.Ct. 1881, 1891–92, 44 L.Ed.2d 508 (1975).

The state may, however, require that a defendant bear the burden of proof with respect to a mitigating circumstance or issue so long as the mitigating circumstance or issue does not negate an enumerated element of the crime charged.[7] *Patterson v.*

---

**7.** Mitigating circumstances or issues have been referred to by using the terms "defense" and "affirmative defense." Unfortunately, these two terms have not been used consistently by Minnesota practitioners. Certain cases of this court suggest that the term affirmative defense applies only to those situations where defendant has the initial burden of production (raising the circumstance or issue), with the burden then shifting to the state to prove beyond a reasonable doubt the lack of the circumstance or issue. In *State v. Niska*, for example, we concluded that an action taken to protect a child from physical or sexual assault or substantial emotional harm "is an affirmative defense" to the crime of deprivation of parental, custodial, or visitation rights. We held that such an action is sufficiently analogous to the "defenses" of self-defense, entrapment and duress to require a similar allocation of the burdens of production and proof. 514 N.W.2d 260, 264 (Minn.1994). Similarly, in *State v. Charlton*, we noted that a defendant is required to adduce sufficient evidence of duress to make the "de-

fense" an issue, but the burden then shifts to the state to show lack of duress, or its converse, specific intent. 338 N.W.2d 26, 30–31 (Minn. 1983). (In *Charlton*, this court did not use the term affirmative defense; this term only arose in the West summary of the case.) We also noted in dicta in *State v. Wahlberg* that "[a]s in situations where the defendant raises an affirmative defense, although the burden rests on the defendant to present evidence of intoxication, the ultimate burden of proving intent remains with the State." 296 N.W.2d 408, 419 (Minn.1980). We further note that the Model Penal Code defines "affirmative defense" to mean the "initial evidential burden is * * * placed on the defendant," and then the prosecution must "[disprove] the defense beyond a reasonable doubt." Model Penal Code § 1.12 cmt. 3 (1985).

In some circumstances, this court has used the term affirmative defense in the opposite sense. In *State v. Brechon*, we noted that claim of right in a trespass case could be considered "as an

*New York*, 432 U.S. 197, 208–15, 97 S.Ct. 2319, 2326–30, 53 L.Ed.2d 281 (1977); *see also State v. Wahlberg*, 296 N.W.2d 408, 418–19 (Minn.1980) (comparing *Mullaney* and *Patterson* and, following *Patterson*, requiring that defendant bear the burden of proving voluntary intoxication by a fair preponderance of the evidence). But, if the mitigating circumstance or issue is the converse of an enumerated element of the crime charged and negates that element, the defendant is required only to adduce sufficient evidence on the proffered defense to make the defense one of the issues of the case; the burden then shifts back to the state to prove beyond a reasonable doubt the lack of the defense, or its converse.[8] *State v. Charlton*, 338 N.W.2d 26, 30–31 (1983) (holding that defendant has initial burden of production with respect to issue of duress for specific intent crime; the burden then shifts back to the state to show lack of duress, or its converse, specific intent, because duress negates element of specific intent); *see also State v. Housley*, 322 N.W.2d 746, 750 (Minn.1982) (noting that once defendant meets his initial burden of production with evidence sufficient to raise the issue of self-defense, the burden shifts to the state to prove beyond a reasonable doubt that the killing was not justified).

In the present case, Auchampach was convicted *inter alia* of two counts of first-degree murder: premeditation and domestic abuse. In Minnesota, an intentional killing may be mitigated to the lesser-included offense of first-degree manslaughter if the defendant acted in the heat of passion. Minn.Stat. § 609.20(1); *State v. Shepherd*, 477 N.W.2d 512, 515 (Minn.1991) (premeditated murder) (citing *State v. Buchanan*, 431 N.W.2d 542, 549 (Minn.1988) (also premeditated murder)). That is, even if the defendant acted with premeditation, if the defendant also acted in the heat of passion, the defendant is guilty only of first-degree manslaughter. *See State v. Richardson*, 393 N.W.2d 657, 662–63 (Minn.1986) (premeditated murder). Heat of passion is a legislatively created issue which mitigates premeditated first-degree murder to first-degree manslaughter. Both it and the "justification statutes evince a legislative intent to excuse or mitigate a homicide where a defendant behaves as would a reasonable person."[9] *Buchanan*, 431 N.W.2d at 549 (citing *State v. Boyce*, 284 Minn. 242, 253–54, 170 N.W.2d 104, 112 (1969)).

Under Minnesota's homicide statutes, the absence of heat of passion is not an

ordinary *defense*, requiring the defendant to present evidence, with the burden of persuasion on the prosecution to disprove the defense beyond a reasonable doubt; or * * * as an *affirmative defense*, requiring the defendant to go forward with evidence raising the defense and shoulder the persuasion burden of establishing such defense by a preponderance of the evidence." 352 N.W.2d 745, 749 (Minn.1984) (emphasis added) (citing 1 *Wharton's Criminal Law* § 39 (C. Torcia 14th ed. 1978)); *see also Alford v. State*, 806 S.W.2d 581, 584 (Tex.Ct.App.1991) (noting that Texas' Penal Code designates only four "affirmative defenses": the due diligence defense to criminal responsibility of a corporation or association; insanity; mistake of law; and duress), *aff'd*, 866 S.W.2d 619 (Tex.Crim.App.1993). The legislature has also used affirmative defense to require the defendant to bear not only the burden of production, but the burden of persuasion as well. *See* Minn.Stat. § 169.121 (1994); Minn. Stat. § 169.791 (1994); Minn.Stat. § 609.205(1994); Minn.Stat. § 609.26, subd. 2 (1994), *cited in State v. Niska*, 514 N.W.2d at 264; Minn.Stat. § 609.344 (1994); Minn.Stat. § 609.49 (1994).

Because the proper legal use of affirmative defense does not affect our holding in this case, we need not resolve this lack of consistency in its

use. We note the inconsistency, draw the attention of practitioners to it, and cite the maxim of Justice Oliver Wendell Holmes on the importance to think accurately and to think things, not words. *Holmes–Laski Letters: The Correspondence of Mr. Justice Holmes and Harold J. Laski 1916–1935* 738 (Mark DeWolfe Howe ed., 1953); Silas Bent, *Justice Oliver Wendell Holmes* 197 (1932).

8. By placing on the defendant an initial burden of production, "the state's difficulty in 'proving a negative' is alleviated, making it reasonable for the state to disprove the defense." *State v. Paige*, 256 N.W.2d 298, 304 (Minn.1977), *cited in Charlton*, 338 N.W.2d at 31.

9. The justification statutes discussed in *State v. Boyce* are Minnesota Statutes §§ 609.06–.065 (1994). Section 609.06 sets forth the instances when reasonable force may be used upon or toward the person of another. Section 609.065 authorizes the intentional taking of a life only "when necessary in resisting or preventing an offense which the actor reasonably believes exposes the actor or another to great bodily harm or death, or preventing the commission of a felony in the actor's place of abode."

enumerated element of premeditated first-degree murder. On the contrary, the existence of heat of passion is a mitigating circumstance and an enumerated element of the separate crime of first-degree manslaughter. Therefore, from a federal constitutional perspective, the state is not required to prove the absence of heat of passion before it may convict a defendant of premeditated first-degree murder. *See Patterson,* 432 U.S. at 212–16, 97 S.Ct. at 2328–30. But the Minnesota legislature has not explicitly chosen to place on the defendant the burden to prove by a fair preponderance of the evidence that the defendant acted in the heat of passion. Moreover, this court has specifically approved the use of jury instruction language verbatim to that contained in CRIMJIG 11.05, which places on the state the burden to prove beyond a reasonable doubt the absence of heat of passion. *See State v. Robinson,* 539 N.W.2d 231 (Minn.1995) (second-degree intentional murder); *Persitz,* 518 N.W.2d at 848–49 (premeditated murder); *State v. Gray,* 456 N.W.2d 251, 258–59 (Minn.1990) (premeditated murder and felony murder), *cert. denied,* 498 U.S. 1030, 111 S.Ct. 687, 112 L.Ed.2d 678 (1991). We conclude that when, as in this case, the defendant is charged with premeditated murder and sufficient evidence is adduced at trial for a jury reasonably to infer that the defendant caused the death of another person in the heat of passion, provoked by such words or acts of another as would provoke a person of ordinary self-control under like circumstances, the state has the burden to prove beyond a reasonable doubt the absence of heat of passion.

█ In the present case, the trial court did not specifically instruct the jury that the state bore the burden to prove beyond a reasonable doubt that Auchampach did not act in the heat of passion. However, we conclude that the court's jury instructions, when viewed as a whole, were more than adequate to inform the jury of the state's burden of proof.

First, the court instructed the jury that Auchampach was presumed innocent until proven guilty and that the state bore the burden to prove Auchampach's guilt beyond a reasonable doubt. Second, the court told the jury that the jury instructions must be considered as a whole and that the jury was to regard each instruction in light of all the others. Third, immediately after instructing the jury on the elements of first-degree murder, the trial court instructed the jury on heat of passion manslaughter, pursuant to CRIMJIG 11.04. Fourth, after instructing the jury on all ten counts, the court instructed the jury on lesser-included offenses. Pursuant to CRIMJIG 3.20, the court instructed the jury that if the jury found beyond a reasonable doubt that Auchampach committed a crime, but had a reasonable doubt as to which crime Auchampach committed, Auchampach could only be found guilty of the lesser crime. The court then properly instructed the jury on the elements of the lesser-included offense of manslaughter in the first degree, pursuant to CRIMJIG 11.20. The court also instructed the jury pursuant to CRIMJIG 11.02 that an unconsidered or rash impulse, even though it includes an intent to kill, is not premeditated. At no time did the court instruct the jury that the defendant bore the burden to prove any element of the crimes charged. Finally, the state explicitly argued during closing argument that Auchampach did not act in the heat of passion, and the defense argued that defendant was guilty only of first-degree manslaughter because the state failed to prove beyond a reasonable doubt Auchampach's guilt of any greater crime charged. *See Persitz,* 518 N.W.2d at 849 (noting that a refusal to give a particular instruction is not error when both counsel argued the issue in closing argument); *Daniels,* 361 N.W.2d at 832 (same). We conclude that the jury instructions in this case were more than sufficient to instruct the jury on the state's burden of proof.

Having concluded that the instructions to the jury were more than sufficient to instruct the jury on the state's burden of proof with respect to the charge of premeditated murder, we find it unnecessary to proceed with a similar analysis of these same issues with respect to the charge of murder while committing domestic abuse and we decline to do so in this case.

## II.

■ Auchampach next challenges his conviction under the domestic abuse homicide statute, Minn.Stat. § 609.185(6) (1994), arguing that the statute violates due process because the term "pattern" in the phrase "past pattern of domestic abuse" is unconstitutionally vague. We conclude that the statute is not impermissibly vague in all of its applications. We have considered this issue in two recent domestic abuse homicide cases and concluded there, as we do here, that the statute, including the word "pattern," meets the constitutional requirements of clarity. *See Robinson*, 539 N.W.2d at 239; *State v. Grube*, 531 N.W.2d 484, 490–91 (Minn.1995).

Minnesota Statutes section 609.185(6) provides that any person who causes

> the death of a human being * * * while committing domestic abuse, when the perpetrator has engaged in a past pattern of domestic abuse upon the victim and the death occurs under circumstances manifesting an extreme indifference to human life

is guilty of first-degree murder. The statute defines the term "domestic abuse" as an act that "constitutes a violation of section 609.221, 609.222, 609.223, 609.224, 609.342, 609.343, 609.344, 609.345 [or] 609.713." Minn.Stat. § 609.185. Sections 609.221–.224 prohibit assault in the first, second, third, and fifth degree. Sections 609.342–.345 prohibit criminal sexual conduct in the first, second, third, and fourth degree. Section 609.713 prohibits terroristic threats. The statute requires that the acts of domestic abuse must be committed against a victim who is a "family or household member" as defined in Minn.Stat. § 518B.01 (1994). Section 518B.01, the Domestic Abuse Act, defines a family or household member as "spouses, former spouses, parents and children, persons related by blood, and persons who are presently residing together or who have resided together in the past, and persons who have a child in common regardless

of whether they have been married or have lived together at any time." Minn.Stat. § 518B.01, subd. 2(b) (1994).

Five individuals testified at trial about instances of physical abuse that Auchampach committed against Counts and about threats of physical abuse that Auchampach made to Counts. Moreover, the state presented two separate *ex parte* orders for protection which Counts filed against Auchampach, as well as accompanying affidavits and petitions. The trial court instructed the jury on the elements of domestic abuse homicide, defining domestic abuse as including "physical harm, bodily injury, assault or the infliction of fear of imminent physical harm, bodily injury or assault, between family or household members." *See* Minn.Stat. § 518B.01, subd. 2(a). The court also defined the terms "assault" and "family or household member." The court did not, however, provide the jury with a definition of the term "pattern."

■ We first conclude that Auchampach and Counts were "family or household members," as required by the statute. This is evinced by the fact that Auchampach and Counts had periodically resided together and by the fact that they had one child in common. Minn.Stat. § 518B.01, subd. 2(b). Second, we conclude that the evidence presented at trial was sufficient for the jury to conclude that from the time Auchampach and Counts met in April 1991 until Counts' murder in March 1993, Auchampach engaged in acts of assaultive behavior toward Counts and made terroristic threats against her.[10] *See* Minn. Stat. § 609.713. These acts are proscribed acts of "domestic abuse," as defined under the statutes. *See* Minn.Stat. § 609.185(6). Under any reasonable definition of the term "pattern," Auchampach engaged in a "past pattern of domestic abuse." Therefore, Auchampach's behavior was clearly proscribed by the domestic abuse homicide statute and Auchampach cannot successfully challenge the statute as unconstitutionally vague as

---

10. Most of the evidence presented at trial with respect to Auchampach's assaultive behavior toward Counts was presented as hearsay evidence. Although Auchampach challenged the admissibility of this evidence and other hearsay evidence presented at trial, he failed to do so before this

court. We note that it is important that the evidence presented at trial to demonstrate a past pattern of domestic abuse must meet appropriate admissibility requirements including relevancy and the rules with respect to hearsay.

applied to his conduct. *See Grube*, 531 N.W.2d at 490–91 (holding that appellant could not bring successful vagueness challenge to domestic homicide statute because appellant's behavior evidenced a past "pattern" of domestic abuse under any reasonable definition of the term "pattern").

Affirmed.

COYNE, Justice (concurring specially).

I concur in affirmance of the conviction of defendant of first-degree murder. It seems to me, however, that there was no evidence of heat of passion to support any instruction on the charge of first-degree manslaughter of which the defendant was acquitted. As I see it, the defendant was not entitled to the instruction on heat of passion which was given, for the testimony of his anger and storming out of the victim's house early in the evening does not account for his intentional murder of his former mistress several hours later. During the intervening hours while the defendant was partying with his friends, he several times voiced his intention to kill Counts and he entered into purposeful preparation for committing murder. Even the defendant does not contend that, when he returned to kill her, Counts did or said anything that provoked him and kindled anew the heat of passion generated many hours earlier. Consequently, I see no occasion for an extended discussion of first-degree manslaughter.

As to the defendant's contention that Minn.Stat. § 609.185(6) (1994), the domestic abuse homicide statute, is unconstitutionally vague, there was more than adequate evidence that the defendant's conduct toward Counts constituted a pattern of domestic abuse under any reasonable definition of "pattern." Consequently, it is sufficient to state that the issue is governed by our recent decision in *State v. Grube*, 531 N.W.2d 484 (Minn.1995).

Accordingly, I concur in affirmance.